129 So.2d 816 (1961)
Dixie L. FULLILOVE et al., Plaintiffs-Appellants,
v.
U. S. CASUALTY COMPANY OF NEW YORK et al., Defendants-Appellees.
No. 9379.
Court of Appeal of Louisiana, Second Circuit.
April 12, 1961.
Rehearing Denied May 10, 1961.
Certiorari Denied June 22, 1961.
*818 Jackson B. Davis, Booth, Lockard, Jack, Pleasant & LeSage, Shreveport, for Dixie L. Fullilove, Mrs. Myrtle Webb Fullilove, *819 and Dottie Jean Fullilove, plaintiffs-appellants.
Ferdinand A. Cashio, Shreveport, for State of Louisiana, defendant-appellee.
Before GLADNEY, AYRES, and BOLIN, JJ.
AYRES, Judge.
This case, as well as the case of Caldwell et al. v. U. S. Casualty Company of New York et al., 129 So.2d 813, with which it was consolidated for the purpose of trial, arose out of an accident of June 13, 1958, on U. S. Highway 80, in Lincoln Parish, when an automobile driven by Henderson Jordan and an automobile of plaintiff, Dixie L. Fullilove, occupied by him and his family, driven by Buford Caldwell, while traveling in opposite directions, violently collided. As a result of this crash and collision, Jordan, Caldwell, and Ronnie Webb Fullilove, minor son of Dixie L. Fullilove and his wife, were killed, and Mr. and Mrs. Fullilove and their minor daughter, Dottie Jean Fullilove, were seriously and severely injured.
At the time of the accident, Jordan was an employee of the Department of Public Works, State of Louisiana.
The plaintiffs herein, Dixie L. Fullilove and his wife, Mrs. Myrtle Webb Fullilove, in their individual capacities, and he, for the use and benefit of his minor daughter, instituted this action for damages not only against the State of Louisiana, through the Department of Public Works, by virtue of and pursuant to joint resolutions of both Senate and House of Representatives of the Legislature of Louisiana, but against the U. S. Casualty Company of New York, the insurer of the car driven by Jordan at the time of the accident, and the Southwestern Fire & Casualty Company, the insurer of Jordan's family car. A similar action, pursuant to similar joint resolutions of the Legislature, was instituted by Caldwell's father and mother and the administrator of his estate against these defendants for the recovery of damages allegedly sustained through Caldwell's death.
Following the institution of these actions, the U. S. Casualty Company of New York paid, to plaintiffs in these actions, the sum of $10,000, the amount of its maximum contractual obligation under its policy, one-fourth of which was applied to the claims of the Caldwells and three-fourths to those of the Fulliloves. Accordingly, that defendant was dismissed from the suit.
Southwestern Fire & Casualty Company resisted the actions of plaintiffs on two counts: (1) A denial of negligence on the part of Jordan and (2) a denial of liability on the basis that its insurance policy did not extend to or cover Jordan as an insured at the time of the accident.
The State of Louisiana excepted to plaintiff's actions as disclosing no cause or right of action on the basis that the Louisiana Legislature was constitutionally prohibited from waiving the State's sovereign immunity from suits arising out of torts committed by its agents, servants, and employees. This exception was predicated on the language of Art. III, Sec. 35 of the Louisiana Constitution of 1921, LSA as it then read. Therefore, it was contended, notwithstanding the legislative permission for these plaintiffs to institute and prosecute these actions, that they could not do so because of the State's sovereign immunity from liability. Relying on the decisions in the cases of Marler v. State, La.App. 2d Cir., 1955, 78 So.2d 26; St. Julian v. State, La.App. 1st Cir., 1955, 82 So.2d 85; and the authorities therein cited, the district court overruled the State's exceptions, following which the State answered denying liability on all counts.
Following the filing of answers by the State and by Southwestern Fire & Casualty Company, placing at issue all questions as to Jordan's alleged negligence, as well as the alleged contributory negligence of plaintiffs and of the deceased parties, the nature and extent of the damages and losses sustained by plaintiffs, and the quantum *820 of awards, in the event of the establishment of liability on the part of the defendants, the cases were tried and submitted to the court for decision. While the cases were under consideration and advisement by the trial court and before the rendition of judgments, the Supreme Court, in its decision in the case of Duree v. Maryland Casualty Company, 238 La. 166, 114 So.2d 594, sustained, in that action, the position taken by the State in these cases, that is, that the legislative permission to institute an action against the State could not be construed as a waiver of the State's sovereign immunity for liability for torts of its servants; that the language of Art. III, Sec. 35 of the Constitution effectively barred and precluded the Legislature from waiving the State's sovereign immunity from liability and that, hence, one injured as a result of a tort of an agent or servant of the State could not, under any circumstances, hold the State liable therefor. As a result of that decision, the trial court recalled its prior decision on the State's exceptions and, in its final opinion, sustained them and dismissed the State from the suits.
Judgment was rendered against the Southwestern Fire & Casualty Company, the only remaining defendant, for the amount of its maximum contractual liability under its policy. That defendant appealed to this court and the judgment was affirmed. Caldwell v. United States Casualty Company of New York, La.App., 120 So.2d 285. However, writs of certiorari were granted by the Supreme Court and, on review of the cases there, it was concluded defendant's policy did not cover Jordan at the time of the accident. Accordingly, the judgments of this and the trial court were reversed and plaintiffs' actions were dismissed as to that defendant. 240 La. 859, 125 So.2d 389.
From the judgments dismissing plaintiffs' suits against the State, after trial of the cases on their merits, but in sustaining the exceptions, the plaintiffs prosecute these appeals.
The basis for the present appeals may now be stated.
Since the decision of the court below, founded upon the Duree case, Art. III, Sec. 35 of the Constitution has been amended and completely rewritten, so that it now reads as follows:
"The Legislature is empowered to waive, by special or general laws or resolutions, the immunity from suit and from liability of the state, and of parishes, municipalities, political subdivisions, public boards, institutions, departments, commissions, districts, corporations, agencies and authorities and other public or governmental bodies; and each authorization by the Legislature for suit against the State or other such public body, heretofore and hereafter enacted or granted, shall be construed to be and shall be effective and valid for all purposes, as of and from the date thereof, as a waiver of the defendant's immunity both from suit and from liability. The Legislature shall, by special or general laws or resolutions, prescribe the procedural rules, including rules of venue and service of process, to govern suits against the state and other public bodies; the procedure in such suits, in the absence of applicable procedural rules promulgated by the Legislature, to be the same as in suits between private litigants. No judgment against the state or any other public body shall be exigible, payable or paid except out of funds appropriated for payment thereof. The Legislature may waive any prescription or peremption which may have accrued in favor of the state or other public body against any claim or claims on which suit is so authorized; and any prescription or peremption which may heretofore have accrued, or which would otherwise accrue prior to January 1, 1962, against any claim against the state or other public body on which suit heretofore has been authorized by the Legislature, *821 is hereby waived, provided that suit on such claim is brought prior to January 1, 1962. No suit authorized under this constitutional provision shall be instituted in any court other than a Louisiana State Court. In the case of any such claim on which suit heretofore has been authorized by the Legislature, and the suit was dismissed on the ground that the defendant's immunity from liability had not been waived, another suit on the same claim may be filed at any time prior to January 1, 1962, and such suit shall not be subject to the defense of res judicata based on the dismissal of the prior suit on such claim." (Emphasis supplied.)
This amendment, which was adopted at the election held on November 8, 1960, constitutionally overruled the holding in the Duree case, and by its express terms declared that "each authorization by the Legislature for suit against the State or other such public body, heretofore and hereafter enacted or granted, shall be construed to be and shall be effective and valid for all purposes, as of and from the date thereof, as a waiver of the defendant's immunity both from suit and from liability."
Thus, it is contended there is now no question but that the authorizations which the Legislature granted these plaintiffs to bring these actions are now valid waivers of the State's sovereign immunity both from suit and liability, and that any deficiency which may have existed as to its sufficiency as a basis for a valid judgment against the State has been constitutionally removed.
And, it is contended by plaintiffs that the 1960 amendment expressly related to legislative authorizations granted prior to its adoption, and that it was intended to, and did, apply to any litigation then pending, and not final, which was legislatively authorized.
The questions posed by these appeals are these:
1. Does the constitutional amendment above quoted render valid the legislative permission granted these plaintiffs to sue their sovereign as a waiver of the sovereign's immunity from liability?
2. If so, can and should it be applied to suits pending and not final at the time of its adoption?
3. Was the negligence of Jordan the sole and proximate cause of the several plaintiffs' losses and damages sued for herein?
4. If so, what amounts are they entitled to recover?
Attention is first directed to the fact that the crucial law on which these appeals are based is a constitutional provision. This is important, because, being a constitutional provision, it removes from discussion or consideration any question as to whether it would violate any constitutional provisions or prohibitions, such as might have been the case if the amendment were a legislative enactment. Had it been a statute, then the question might have been posed whether it contravened Art. IV, Sec. 15 of the Constitution (this article prohibits ex post facto laws; laws impairing the obligations of contracts, and the divesting of vested rights), or Art. I, Sec. 2, thereof. (This article is the due process section.) Being a constitutional provision, which is the supreme law, it overrides the Legislature, and all decrees, ordinances, rules and regulations of creatures of the Constitution. Since it is a constitutional provision, no question can arise as to its constitutionality in a case such as this where no federal questions are involved and where no guarantees of the United States Constitution have been invaded.
The matter, then, is not, in our opinion, one of constitutionality. It is simply one of interpretation, and all this court is required to do is to construe its meaning, and give effect to it according to that construction.
*822 The first questions that naturally arise are: What circumstances prompted the people to act? What was the matter sought to be cured or overcome? What was the purpose of the amendment?
The answers to these questions appear obvious. For more than a half century, the people of Louisiana, recognizing the justice of the sentiments expressed more than a hundred years ago by Abraham Lincoln that "It is as much the duty of the Government to render proper justice against itself in favor of its citizens as to administer the same between private individuals," have, by their constitutions (Art. 192, Constitution of 1898; Art. 192, Constitution of 1913; Art. III, Sec. 35, Constitution of 1921), provided that the Legislature could, when it deemed appropriate, authorize its citizens to sue their sovereign for the redress of wrongs, and, in decisions too numerous to mention, the courts consistently held that the granting of such authorization necessarily waived the sovereign's immunity from both suit and liability. However, because of an unfortunate choice of language in a 1946 amendment (prompted, said the Supreme Court, by court decisions in Lewis v. State, 207 La. 194, 20 So.2d 917, and Crain v. State, La.App. 1st Cir., 1945, 23 So.2d 336), the Supreme Court, in its Duree decision, held that the people had, either intentionally or unintentionally, stripped the Legislature of the power to waive the sovereign immunity from liability; that its powers only existed to waive immunity from suit, thus affording a wronged individual only "a trip to the Court House"nothing more. When that decision was rendered, there were pending numerous cases in the various courts of the State which had been instituted by claimants to whom the Legislature had granted authority to sue. Also, notwithstanding the Duree decision, the Legislature, at its 1960 session, had continued to grant legislative authority for suits against the State or its creatures. All these authorizations, made in good faith, were meaningless if the Duree decision remained the law.
The people obviously had never intended the result which the court found in the Duree case to have been accomplished, for, at the first opportunity following that pronouncement, they proceeded to amend the constitutional provision so as to make it crystal clear that the Legislature had not only the power to waive immunity from suit, but also from liability.
Obviously realizing, also, there were outstanding and yet pending numerous authorizations for suit, which, according to the Duree decision, were meaningless, and realizing, too, that requiring these parties to return to the Legislature to secure new authority would only impose an unnecessary burden and delay, they provided that such authorizations as had been previously granted by the Legislature should be effective and valid for all purposes from the date of their granting as a waiver of the defendant's immunity from suit and liability.
Because there were certain cases, notably that of Duree, supra, and Stephens v. Natchitoches Parish School Board, 238 La. 388, 115 So.2d 793, where the suits had been finally dismissed, so that relief through the courts was no longer possible, the amending provision provided:
"In the case of any such claim on which suit heretofore has been authorized by the Legislature, and the suit was dismissed on the ground that the defendant's immunity from liability had not been waived, another suit on the same claim may be filed at any time prior to January 1, 1962, and such suit shall not be subject to the defense of res judicata based on the dismissal of the prior suit on such claim."
This provision was, no doubt, intended to cover cases such as Duree and Stephens, where the judgment of dismissal was complete and final. However, these cases now before the court are not of that character.
*823 The judgments of dismissal concerned here were not final and definitive; they were yet subject to appeal.
As respects the first issue raised by these appeals, it is beyond dispute that whatever deficiency may have existed in their authorizations to sue, as a result of the Duree decision, that deficiency no longer exists. Their authorization is now valid for all purposes, not only as a waiver of immunity from suit but also as to the State's immunity from liability. No new authorization is, or should be, required.
The next question which occurs to us is: Did the people, by the adoption of the amendment, intend that it should operate retroactively? We think they did. The amendment, as will be noted from the language in which it is couched, was carefully and purposely drawn. It covers three situations:
1. Authorizations for suit granted by the Legislature subsequent to its adoption.
2. Authorizations for suits granted by the Legislature prior to its adoption, as to which there had been no final dismissal of the actions brought pursuant thereto because of the legislative inability to waive immunity from liability; and
3. Authorizations for suits granted by the Legislature prior to its adoption as to which there had been a final and definitive dismissal of the actions brought pursuant thereto because of the legislative inability to waive immunity from liability.
As to the first of these situations, there is, and can be, no question. As to the second, the amendment declares they shall be considered valid for all purposes, as a waiver of immunity from both suit and liability. As to the third, the amendment provides that, without further legislative authority, actions may be recommenced on the previous authority and prosecuted to a conclusion, and the State or public authority shall not be entitled to plead the former judgment as being res judicata.
Thus, every situation is expressly provided for, and nothing is required to be implied. That it was intended that the State should not be entitled to claim that if the amendment were given retroactive effect, it would be deprived of "vested rights," it was expressly declared. Even in those cases where final judgments of dismissal had been rendered on the grounds set forth in the Duree decision, it was provided a plea of res judicata could not avail. Consequently, it must be held that the amendment intended in its application to operate both retrospectively and prospectively.
The next question logically to arise is: If the intention of the amendment was to operate retrospectively, nevertheless, should it be given such effect in these cases, where the change in the law occurred after final judgment in the district court, and while the appeals were pending? To state the question another way, should the court adjudge these appeals on the basis of the law as it now is, or on the basis of the law as it was when it was decided by the court below? The law on this question is clear. It is the duty of the court to adjudge a case before it in accordance with the law existing at the time of its own decision, even though, by so doing, it requires the reversal of a judgment which was proper at the time of its rendition. So far as our research has disclosed, the Louisiana courts have always consistently adhered to this principle.
One class of cases where this doctrine is applied is that class where a law creating a cause or right of action is repealed, modified, or superseded by a statute enacted during the pendency of the action founded thereon. In such cases it is consistently held that the pending action is thereby abated, no matter how meritorious it may have been when commenced or at the time it was decided in the district court. Among *824 such cases are: Todd v. Landry, 5 Mart., O.S. 459; State v. Johnson, 12 La. 547; Cooper v. Hodge, 17 La. 476; Frey v. Hebenstreit, 1 Rob. 561; Doss v. Board of Com'rs, 117 La. 450, 41 So. 720; Hymel v. Central Farms & Shipping Co., 183 La. 991, 165 So. 177; City of New Orleans v. Ryman, La.App. Orleans, 1955, 79 So.2d 573.
Another case in which the principle was followed is Garlick v. Dalbey, 147 La. 18, 84 So. 441, wherein it was stated:
"The allegation in plaintiff's petition that she was authorized to bring this suit was not sought to be proved, although put at issue by the answer. Act 94, p. 212, of 1916, dispenses married women from the necessity of being authorized by their husbands for standing in judgment in matters relating to their paraphernal property, and this suit involves a paraphernal claim. This act was adopted after final judgment had been rendered in the lower court; but, the case having been as fully tried below as if plaintiff had had authority to stand in judgment, and she being the appellant, and now qualified to stand in judgment, there is no reason why the case should not be finally disposed of on this appeal." (Emphasis supplied.)
See, also Allison v. Wideman, 210 La. 314, 26 So.2d 826, which was a case involving the prescription of a mineral servitude. When the suit was filed, and when it was decided in the district court, the disputed interest was valid because of the fact that it was co-owned by majors and minors, and because of the then existing law that prescription did not run against minors and that their minority likewise prevented its running against their major co-owners. After the case was decided in the lower court, and while it was pending on appeal, the law was changed to provide that minority of one co-owner would not prevent the running of prescription as to the major co-owners. The Supreme Court held that the case was to be adjudged by it according to the law then existing, and reversed the district court's judgment even though the district court had correctly decided the case on the basis of the law then in effect.
While Art. 8 of the LSA-Civil Code provides that a law can prescribe only for the future, and can have no retrospective operation nor impair the obligation of contract, it is well settled that an exception to this rule are laws which are remedial or curative in their nature. "Remedial Statutes" are statutes which confer a remedy, and "remedy" is the means employed to enforce a right or redress an injury. Young v. Staman, La.App. 2d Cir., 1940, 200 So. 187; Washington Nat. Ins. Co. v. McLemore, La.App. 2d Cir., 1935, 163 So. 773. "Curative Statutes" are statutes which, by their very nature, are intended to enable persons to carry into effect that which they have designed and intended, but which have failed of their expected legal consequences by reason of some statutory disability or irregularity in their action. Such acts are, by their very nature, intended to operate on past transactions, and are necessarily retrospective. Curative statutes, by reason of their remedial and retrospective nature, are to be liberally construed to correct the mischief or advance the remedy intended, and are applicable not only to past transactions but also to pending cases, either in the trial court or on appeal. 82 C.J.S. Statutes § 430, p. 1002.
The amendment here involved was both curative and remedial. It was curative in that one of its principal objects was to make valid, ab initio, the legislative authorizations to sue previously granted as a waiver of both the immunity from suit and from liability. It was remedial in that its other principal object was to confer a remedy for the redress of wrongs which those already authorized to sue had sustained. Thus, if the amendment be tested as if it were a statute, which it is not, it would yet be entitled to be accorded retrospective effect. Being a constitutional amendment, *825 and expressly declaring the effect which the courts shall give prior legislative authorizations, it is superior to codal articles, or legislative statutes and constructions thereof.
Prior to the amendment, the Legislature was, without doubt, authorized to grant these plaintiffs the right to sue, and the resolution which it adopted expressly authorized suit. What the Legislature lacked, according to the Duree decision, was the power to confer a remedy. This is obvious from the following language found in that decision:
"Section 1 of that enactment recites: `Be it enacted by the Legislature of Louisiana that suit against the State of Louisiana, through the Department of Institutions of the State of Louisiana, is hereby authorized to be filed and prosecuted to judgment by Mrs. Allene Hopwood Duree, * * *.' Undoubtedly this section granted to plaintiff the authority and right to sue the state." (Emphasis supplied.) Duree v. Maryland Casualty Co., 238 La. 166, 114 So.2d 594, 597.
However, the court then proceeded to hold that the power to grant authority to sue did not include the power to confer a remedy which, it held, was ultra vires the Legislature, and, therefore, Mrs. Duree was denied recovery.
Another rule which prevails in this State is this: When there has been a change in the facts of a case between the dates of the final judgment in the district court and the date of the appeal, which will justify the reversal of a judgment, the appellate courts will not hesitate to reverse, since to do so will be to shorten litigation and best serve the ends of justice. Some cases applying this rule are: Mounicou v. Haistre, 182 La. 885, 162 So. 718; People's State Bank v. United States Fidelity & G. Co., 154 La. 835, 98 So. 263; Walker v. Myers, 150 La. 986, 91 So. 427.
As was said by the court in Mounicou v. Haistre, supra [182 La. 885, 162 So. 718]:
"* * * The only reason, therefore, for the judgment which denied to the plaintiff a right of action has disappeared; * * *. Whether that was a sufficient reason for the dismissal of the suit is a question which we need not now decide. It was the only reason for the judgment which was rendered, and, as the reason has vanished, the judgment must be set aside and the case remanded * * *." (Emphasis supplied.)
In these cases, the conclusion is inescapable that the only reason for the dismissal of these suits has now vanished, and equity requires the reversal of the judgments.
The State of Louisiana contends that the Constitutional Amendment adopted in November, 1960 (which expressly validated those prior authorizations by the Legislature for suits against their sovereign for all purposes, both as a waiver of the sovereign's immunity from suit and from liability), is, itself, unconstitutional, in that it violates Art. 8 of the LSA-Civil Code and and Art. IV, Sec. 15 of the Constitution.
The 1960 amendment operates retrospectively; and it was so intended. This fact does not, however, render it unconstitutional. The Constitution is the supreme law, to which all legislative acts and all ordinances, rules, and regulations of creatures of the Legislature must yield.
The Civil Code of Louisiana is but a legislative act and has no greater force than any other legislative act. Being such, it is subject to amendment or repeal, either in whole or in part, by the Legislature. A settled rule of statutory construction is that, if there be found to exist conflict between an article of the Civil Code and a legislative act subsequently enacted, then the former must yield to the latter, because the last act adopted is *826 considered to be the latest expression of the Legislature, and, therefore, deemed to have repealed, to the extent of the prior conflicting or inconsistent provision, the codal provision earlier enacted. State v. Board of Com'rs of Caddo Levee Dist., 188 La. 1, 175 So. 678.
Thus, if the Constitutional Amendment were to be considered only as a legislative enactment, and, if it were found to conflict with Art. 8 of the LSA-Civil Code, nevertheless, since it was last enacted, it would override the codal provision to the extent of such conflict. However, since it is not a legislative act, but is a part of the organic lawthe Constitutionit is the supreme law, and all legislative acts which might be found to conflict therewith must yield to it, rather than that it yield to them.
Again, it is argued that Art. IV, Sec. 15 of the Constitution, which prohibits the enactment of ex post facto laws, laws impairing the obligations of contracts, and laws divesting vested rights, has also been contravened. While, for the reasons hereafter given, it may not be correctly said that, by the Constitutional Amendment under consideration, the State is deprived of any "vested right," even if such were true, the amendment would nevertheless be valid. The sole reason advanced by the State to support its position that it may not be divested of a "vested right" is the constitutional provision already mentioned. What the people, by their constitution, have given, they, by a change in that document, may take away. No constitutional provision has such sanctity that the people may not, by a subsequent amendment, change, modify, or delete that provision.
An amendment to a constitution, like an amendment to a legislative act or a codicil to a will, while a part of the Constitution, is not to be regarded as though it had been a part of the original document, but rather is to be considered as a codicil or second instrument, altering or rescinding the original to the extent that the original may conflict with the amendment, and is to be treated as superior to, and superseding, the original or earlier provisions to the extent of such conflict. 16 C.J.S. Constitutional Law, § 42, p. 131. In State ex rel. Kemp v. City of Baton Rouge, 215 La. 315, 40 So.2d 477, 482, the Supreme Court gave recognition to this principle, saying:
"Express and specific authority for the allocation of Parish revenues and funds to the municipal government are contained in this constitutional amendment; and to the extent that Article 4, Section 12 and Article 10, Sections 1 and 5 are in conflict therewith, they must yield to the latest expressions of the will of the people." (Emphasis supplied.)
See the authorities therein cited.
Thus, if conflict be found between Art. IV, Sec. 15 of the original Constitution and the 1960 amendment, the earlier provision must yield to this latest expression of the will of the people.
What has been said applies with equal force to Art. IV, Sec. 4 of the Constitution, which the State also asserts to have been contravened by the latest amendment. This amendment is not, in our opinion, class legislation, nor does it effect a loan, pledge, or grant to or for any person of the funds or property of the State. If a conflict could be found existent between those provisions and the most recent expression, those prohibitions exist because, and only because, they are found written in the Constitution. The amendment with which we are here concerned is now also written in that Constitution, and the earlier provisions are not entitled to greater dignity because of their earlier adoption. On the contrary, the amendment is superior to the original and, to the extent that it conflicts with the original, it supersedes it, because it is the latest expression of the will of the people.
*827 In the case of State v. Macaluso, 235 La. 1019, 106 So.2d 455, 457, as here, the contention was urged that the amendment violated existing provisions of the original Constitution, and it was argued that, under proper rules of construction, it was the duty of the court to harmonize, if possible, inconsistent constitutional provisions, and, further, that repeal of prior constitutional provisions by implication was not favored. These contentions were answered in this manner:
"The contention cannot be sustained that the Act should be held violative of State constitutional provisions adopted before the amendment of our Constitution by Article VI, Section 19.1, for the statute under consideration was enacted pursuant to and within the bounds of the constitutional authorization granted to the legislature by the amendment of the Constitution by Section 19.1. The earlier State constitutional provisions must yield to the subsequently enacted Article VI, Section 19.1, to the extent that they are in conflict therewith. State ex rel. Kemp v. City of Baton Rouge, 215 La. 315, 40 So.2d 477. As stated at 11 Am. Jur. `Constitutional Law', Section 54, pp. 663-4, a constitutional amendment `cannot be questioned on the ground that it conflicts with pre-existing provisions. If there is a real inconsistency, the amendment must prevail because it is the latest expression of the will of the people. In such a case there is no room for the application of the rule as to harmonizing inconsistent provisions.' See also, 16 C.J.S. Constitutional Law § 26.
"Further, the constitutional provision specially authorizing ex parte expropriations prior to judgment necessarily controls in the event of any conflict between it and general State constitutional provisions pertaining to due process and separation of powers, for a special provision prevails in respect of its subject matter over general provisions in conflict therewith. State ex rel. Kemp v. City of Baton Rouge, 215 La. 315, 40 So.2d 477; Berteau v. Police Jury, 214 La. 1003, 39 So.2d 594; 16 C.J.S. Constitutional Law § 25; 11 Am.Jur. `Constitutional Law' Section 53 at p. 663."
As has already been said, the State is not being deprived of a "vested right." The State argues that the district court's judgment dismissing, as of nonsuit, the suits of these appellants was its property, vested by the judgment of the district court, and that the people were constitutionally prohibited from divesting it thereof, even by constitutional means. It is well settled that one never has a "vested right" in a judgment of a court until the courts have lost control of the judgment as a result of its having become final and unappealable. As declared in 16 C.J.S. Constitutional Law § 271, pp. 1266, 1267:
"There can be no vested right, however, in a verdict, order, or judgment, while it remains subject to the control of the court in which or by which it was rendered, or while the order or judgment is subject to appellate review." (Emphasis supplied.)
Here, the judgments which the State contends are its vested rights were, and are, yet within the control of the courts; they were not final and are subject to review on appeal. So long as that situation prevails, no "vested rights" thereto exist.
While the Legislature may not divest a person of a vested right because of the limitations placed upon it by the people in their constitution, such restrictions as are found in the Constitution are the people's restrictions, placed upon their creatures. The people are free to remove those restrictions and, if they choose to do so, the courts are not to judge the wisdom of their decision. Therefore, even if the 1960 amendment should divest vested rights, it *828 must nevertheless be given effect because it is the latest expression of the will of the people, and, as such, superior to, and due precedence over, all prior conflicting or inconsistent constitutional or legislative expressions.
The cases cited by appellees in their brief involve legislative contraventions of constitutional provisions; none of them involve changes of the Constitution itself, and, hence, they are not appropriate to this case. If the law in question were a legislative act, then a serious question would be raised as to whether the Legislature had transgressed it constitutional limits. It is not such an act; it is a constitutional provision, and, where properly adopted, is not subject to challenge because other earlier constitutional provisions may be said to have been curtailed or abridged thereby. It is, as heretofore pointed out, the superior law, to which all earlier laws must yield. Consequently, cases which hold that legislatures may not transcend constitutional restrictions, shed no light on the issue here posed.
Appellees' final contention is that, if the 1960 amendment be declared effective as to these actions, nevertheless, these plaintiffs should be relegated to the filing of new suits for the reason that was the only relief accorded them by the amendment. The quoted portion of the amendment was intended or designed for those cases where the courts had lost control of the cases because of the complete finality of the dismissal, such as the Duree or Stephens case. The phrase "and the suit was dismissed on the ground that the defendant's immunity from liability had not been waived" means, we think, a final, complete, and absolute dismissal, as to which the appellate courts can no longer exercise jurisdiction. It does not mean, nor should it be given such effect, that a judgment which is yet subject to be corrected, either by the court of its rendition or by the appellate courts on review, is to be given such finality that only by another suit can an injured party's rights be protected.
Noted, also, is that the amendment says another suit "may" be commenced, not that it "shall" be commenced. Had the provision intended that in all cases new suits must be commenced, then it would have most certainly used the word "shall" instead of the permissive "may," as was used. This choice of words clearly indicates the purpose to require new suits in only those cases where the judgments of dismissal were not subject to correction, and had attained the status of res judicata. The judgments appealed here do not fall in that category.
Furthermore, we think it is clear that the inhibitions which are found originally in Art. IV of the Constitution were intended as protection for the citizen, and not for the State. As stated in 16A C.J.S. Constitutional Law § 417, pp. 99, 106,
"As long as private rights are not infringed, the state may constitutionally pass retrospective laws waiving or impairing its own rights, or those of its instrumental subdivisions or of the public generally; and it may impose upon itself or its subdivisions new liabilities with respect to transactions already past, despite a constitutional prohibition against the retroactive imposition upon the people of counties or municipal subdivisions of new liabilities with respect to past transactions. Thus, statutes are valid which provide for the enforcement of existing moral obligations of the state or its subdivisions which were theretofore unenforceable; * * *." (Emphasis supplied.)
In Graham Paper Co. v. Gehner, 332 Mo. 155, 59 S.W.2d 49, 51, it was said:
"* * * The provision of the Constitution inhibiting laws retrospective in their operation is for the protection of the citizen and not the state. * * *."
No good reason exists, nor can any be found, why these cases should not be decided on this record. The exceptions urged *829 by the State were initially overruled, and it filed its answer placing at issue all the material allegations of plaintiffs' complaints, and, additionally, pleaded special defenses. The State's attorney was present throughout the trial and vigorously represented it at every stage of the case. It was not until after the trial that the Duree case was decided, and then the State renewed its exceptions, with the result that the court recalled its former ruling, sustained the exceptions, and dismissed plaintiffs' suits as to that defendant.
Since the State was protected at every stage of the case, no valid reason exists why the plaintiffs should be relegated to another action. To force them to the expense, delay, and inconvenience of another trial would be most inequitable and would retard justice. The amendment does not require it and neither equity nor justice demands it.
Next, logically, for consideration is the question of liability, vel non, of the defendant, State of Louisiana, predicated upon the fault or negligence of Jordan. As heretofore pointed out, Jordan was, at the time of the accident, an employee of the Department of Public Works of the State of Louisiana. The record conclusively establishes that, at the time of the accident, Jordan was acting in the course and scope of his employment. Nor does the record admit of any doubt or question that Jordan's negligence was the sole, only, and proximate cause of the accident.
The scene of the collision was U. S. Highway 80 at a point approximately one mile east of Choudrant. This highway, in that area, is a 2-lane, paved thoroughfare running in an east and west direction. The two lanes are marked by a center line. From the scene, for a considerable distance in either direction, the highway is straight, and the locus of the accident was in what might be termed a valley, as there was a hill approximately three-fourths of a mile west and another approximately one-half mile east of the scene. The weather was clear and fair. No obstructions existed to obscure the view of motorists traveling in either direction. The Jordan car was traveling west and the Fullilove vehicle east. Jordan was alone in his car. Caldwell occupied the driver's seat in the Fullilove car, with Fullilove seated on the right side with his wife in the middle. The minor children were on the rear seat.
The testimony and the physical facts show that the accident occurred on the south side of and in the right traffic lane of plaintiffs. For a distance of several miles, the Jordan vehicle weaved, to and fro, from one side of the highway to the other, and, at least on two other occasions, collisions were barely avoided with other cars which were forced off the road. As plaintiff's and Jordan's vehicles approached each other, the Jordan vehicle suddenly swerved to its left into the left traffic lane directly in front of plaintiff's automobile, with which it collided head-on. Both vehicles, demolished beyond repair, were enmeshed in a straight alignment in the south lane of the highway. Their disentanglement required the services of two wreckers.
There is practical unanimity among all the witnesses as to the manner in which the collision occurred. They were disinterested witnesses, unrelated to, and, until after the accident, were unknown to the plaintiffs. No purpose could be served by a prolonged or detailed discussion of the testimony of the many witnesses, whose testimony, uncontradicted, established by an overwhelming preponderance of evidence that the accident resulted from Jordan's gross negligence.
The rules for the operation of motor vehicles upon the highways of this State are set forth in LSA-R.S. 32:221 et seq. Particularly appropriate to the facts of this case are Secs. 231 and 232, which provide that the driver of a vehicle shall drive upon the right half of the highway as closely as possible to the right edge or curb, except when overtaking and passing another vehicle, and, when meeting, the drivers shall *830 pass each other to the right, each according the other, for at least 200 feet before meeting, one-half of the main-travel portion of the highway.
No doubt exists that these rules were flagrantly violated by Jordan. In the recent case of Noland v. Liberty Mutual Insurance Company, 232 La. 569, 94 So.2d 671, 673, the Supreme Court, with respect to the very issue herein presented, declared, after quoting the sections of the statute hereinabove cited:
"In view of these provisions, and since the instant collision occurred while the bakery truck was in the wrong traffic lane, the presumption is that Goudeau was negligent in the operation of his vehicle. And it follows that the burden is upon him to show that the accident was not caused by his negligence or that there were justifiable circumstances which would excuse his conduct. See Schick v. Jenevein, 145 La. 333, 82 So. 360 and Miller v. Hayes, La.App., 29 So.2d 396."
Moreover, where one of the vehicles is on its wrong side of the road when a collision occurs, a presumption is thereby established that the driver of the vehicle in the wrong lane is negligent. Ford, Bacon & Davis, Inc. v. Shaw, 8 La.App. 751; Armour & Co. v. Hicks Co., La.App. 2d Cir., 1932, 18 La.App. 504, 138 So. 676; Kelly v. Schmidt & Zeigler, 142 La. 91, 76 So. 250.
No explanation was offered as to why Jordan left his proper lane of travel and a place of safety and darted into the wrong lane; that such maneuver was highly dangerous was tragically proved only seconds later. His presence in the wrong lane establishes a prima facie case of negligence. The record discloses no effort was made to disprove or to rebut it. Only one conclusion can logically follow from the established facts, that is, that Jordan was negligent, and that such negligence resulted directly in the damages and losses sustained by these plaintiffs.
The liability of the State in these cases is predicated on LSA-C.C. Arts. 2317 and 2320, which provide that one is responsible not only for the damage occasioned by his own act but for that which is caused by the act of another for whom he is answerable. For example, employers are answerable for the damage occasioned by their servants and employees occasioned in the discharge of their employment. The doctrine of "respondeat superior" is, therefore, clearly applicable and imposes responsibility on the State as the employer for the torts of its employees
The final question relates to quantum of the awards to compensate plaintiffs for the injuries sustained and damages done.
In this regard, consideration will first be directed to the injuries sustained individually and personally by plaintiff, Dixie L. Fullilove. Fullilove, a civilian clerical employee at the Barksdale Air Force Base at an annual salary of $3,680, was 39 years of age at the time of the accident. The accident occurred probably between 10:00 and 10:30 p. m. June 13, 1958. No medical attention was administered until after his arrival, by ambulance, at the Ruston-Lincoln Sanitarium between 11:00 p. m. and midnight.
On arrival at the hospital, plaintiff was attended by Dr. Marvin T. Green, who, on examination, found plaintiff had sustained comminuted fractures of his left femur immediately above the knee, of both bones below the knee, of the left ankle, and of his left wrist. Plaintiff also sustained numerous cuts and lacerations on his forehead, face, nose, mouth, and arms. At the time of his arrival at the hospital, plaintiff, according to the doctor's testimony, was suffering very severe pain and was in a state of shock. He was described as ashen in color and cold. His condition caused the doctor to despair of his life.
*831 Having lost considerable blood, plaintiff was given immediate blood transfusions and placed under heavy sedation. Temporary splints were applied to the fractures. A metal brace was placed on the injured left leg in an effort to hold the fragmented bones in position during the time plaintiff remained in the Ruston-Lincoln Sanitarium where the primary medical attention was directed to the saving and preservation of life.
After 11 days' confinement in the local hospital, plaintiff was transferred to the Veterans Administration Hospital in Shreveport and placed under the care of Dr. John W. Jackson, an orthopedist, under whose care he continued until the date of trial. Dr. Jackson corroborated the findings of Dr. Green as to the numerous comminuted fractures sustained by plaintiff. When first seen by Dr. Jackson, numerous areas of contusions and ecchymosis throughout the entire chest wall were observed, as well as numerous abrasions and superficial lacerations and hematomas of his chest, abdomen, and back, as well as on both upper and lower extremities. The fracture of the lower left extremity, according to Dr. Jackson, entered into the ankle joint and others came in close proximity to the knee joint.
Plaintiff was placed in a cast of plaster of Paris, known as a Spiker cast, extending from his upper breasts to his toes. He was maintained in this character of cast until November 11, 1958, when it was removed and he was placed in a long-legged plaster cast of which he was not relieved until about February, 1959. Plaintiff was then placed on crutches and in a wheel chair and subjected to therapy in the treatment of the injuries to his leg.
Dr. Jackson was of the opinion that maximum improvement could be expected within six months from the date of his deposition given February 13, 1959. The opinion was expressed that, even with maximum-anticipated recovery, the movement of the knee would be restricted to about 50% of its normal flexibility. Plaintiff also sustained a permanent shortening, by 1¾ inches, of the left leg.
Moreover, plaintiff sustained a loss of about 40% of the normal motion in his hand, with a deviation of the wrist toward the thumb side, described as angulated and a poor position for hand functioning. This condition prevents complete closure of the hand and fingers of the left hand. In addition, the small finger is internally rotated so that, in closing his hand, the finger angulates toward the base of the thumb. This condition prevents the use of the hand in the operation of typewriters or other business machines, and can only be alleviated by an operation, through an open reduction, resecting the distal end of the left ulnar and doing a rotation osteotomy of the left small finger. This operation was said to require considerable skill and a period of approximately three months for recovery.
Plaintiff also sustained an internal tibial torsion of the left leg of from 10 to 15 degrees so that he walks with an intoeing of his left foot.
From the aforesaid injuries, the medical evidence leaves no doubt of a strong probability of the development of traumatic arthritis in the fractured sites, particularly in the involved joints.
Dr. Ray E. King, also an orthopedist, corroborated Dr. Jackson's testimony, and generally and essentially agreed with Dr. Jackson on his findings and conclusions.
A possibility exists that plaintiff may be able to return to his employment and do sedentary work but, even so, he would experience considerable discomfort. However, whether he may be able to again perform the duties of his employment is a matter of uncertainty and possible doubt. Nevertheless, it appears problematical whether plaintiff will hereafter be able to secure employment in a competitive labor market in competition with those without physical handicaps.
The physical pain and suffering undergone and endured by plaintiff was, without *832 doubt, severe, particularly when lying on the roadside without medical attention awaiting transportation to a hospital, during a period of a week or ten days when his condition was classified as critical, and during the succeeding nine or ten months when his body was immobilized in a cast. Moreover, plaintiff has sustained substantial impairment of his physical functions. Nor has he been entirely relieved of his pain and suffering. The record, too, leaves no doubt but that he will continue, for some considerable and unpredictable period of time, to experience some pain and discomfort.
For the aforesaid items, we are of the opinion plaintiff should have and recover judgment for the sum of $35,000.
Next for consideration are the special damages sustained by plaintiff, Dixie L. Fullilove, in the nature of hospital and medical expenses, loss of wages for himself and wife, and funeral expenses for the interment of his minor son. Brief reference to some of these items will suffice. For the loss of his own wages, the record amply establishes, as a minimum, the amount claimed of $4,500. Mrs. Fullilove is shown to have sustained the loss of wages exceeding $1,000, and that amount should be allowed. The total of these items, the correctness of which has been established, many of which are not contested, aggregate the sum of $11,947.25. In addition, there is claimed, for additional medical and hospital expenses rendered by the Veterans Administration, the sum of $4,642.99 which plaintiff seeks to recover. This claim is made under the so-called "Windfall Doctrine."
In this connection, it is shown that these hospital expenses were incurred on account of this accident and that, under the jurisprudence of this State, if, through charity, affection, or some contractual relationship, the victim of an automobile accident does not have to pay medical bills or hospital expenses, the victim can, nevertheless, collect from the malefactor, the tortfeasor. The majority rule that an injured person is entitled to recover, as an element of damages for his injuries, the value of nursing and physician's services, and for medical and hospital bills providently incurred in his behalf although he be not personally bound for their payment and although such services be gratuities rendered to him, was recognized by this court in Williams v. Campbell, La.App. 2d Cir., 1938, 185 So. 683. See, also, 15 Am.Jur., "Damages," § 199; 128 A.L.R. Annotation, p. 687; Sainsbury v. Pennsylvania Greyhound Lines, 4 Cir., 183 F.2d 548, 21 A.L.R.2d 266; Scruggs v. V. Frank Lynn Co., Inc., La. App. 2d Cir., 1941, 6 So.2d 92.
Whether the Government itself, on behalf of the Veterans Administration, can recover is apparently irrelevant; for, if the Government can recover, this veteran can also recover of a tort-feasor because, in that event, that would be an expense which he must meet. On the other hand, if the Government itself cannot recover because the claim is a gratuity, that supplies the basis of recovery in this plaintiff because it would then arise out of philanthropy and would fall within the majority rule as hereinabove stated. It has been held, however, that such a claim is not a recoverable item so far as the Veterans Administration is concerned. Rayfield v. Lawrence, 4 Cir., 253 F.2d 209, 214. The court, in that case, stated:
"The Government has no cause of action against the defendant for the value of hospital and medical services rendered the plaintiff. United States v. Standard Oil Company, 332 U.S. 301, 67 S.Ct. 1604, 91 L.Ed. 2067, and United States v. Gilman, 347 U.S. 507, 74 S.Ct. 695, 98 L.Ed. 898. With the Government precluded from recovering of the tort feasor, the plaintiff is the only party who may recover under any theory. We think, therefore, that defendant should not be able to escape liability for the medical and hospital expenses incurred by his negligence." (Emphasis supplied.)
*833 We therefore conclude that plaintiff should likewise recover this item.
Next for consideration is the quantum of damages to compensate Mrs. Myrtle Webb Fullilove for the injuries sustained by her. Mrs. Fullilove, sitting between her husband and Caldwell, the driver of the car, saw that a collision was imminent when Jordan swerved his car into their lane of traffic. She screamed and then heard the impact of the collision. She was thereafter intermittently conscious. She was removed from the car and was placed alongside the highway. She did not, at first, realize many of the injuries sustained by her but was very conscious of an injury to the roof of her mouth which was apparently split in two. She was bloody from profuse bleeding and bystanders held her hands to keep them from the wounds on her face. Her thoughts were of impending death. For more than an hour she had no ministration of medical attention. Consciousness of horrible injuries to her husband, son, and daughter, as well as to Caldwell, the family's friend, increased and intensified her own injuries and suffering.
Following the accident, Mrs. Fullilove was treated by Dr. Marvin T. Green, who found her in a very serious condition, having suffered serious and multiple injuries over her body. She continued under his care and treatment from June 13th to June 24th, inclusive. On her transfer to Shreveport, Mrs. Fullilove was placed under the care of Dr. Ray E. King, orthopedist; Dr. Dudley D. Isom, an oral surgeon; Dr. J. L. Custer, a specialist in the treatment of the eyes, ears, and nose; and Dr. S. E. Smith, Jr., a dentist.
Dr. Green's statement, as relates to her condition, is as follows:
"Mrs. Fullilove was brought into the hospital by ambulance and was brought into the emergency room on an ambulance stretcher. She was apparently in great distress. She was quite bloody. Her face was rather mutilated and she was generally disheveled.Yes, sir, she was apparently in great distress.Yes, she was conscious and she would respond to questions.Her face was very must distorted, her nose had been bashed in and the mouth cut. Most of her teeth, most of her front teeth had been avulsed and she was bleeding rather profusely from a laceration across the bridge of her nose. One eye was blackened and closed and there were multiple lacerations about her face. There was some distortion in her eyes.There were severe lacerations about her mouth and lips, and gums. Her nose was flattened and cut across the bridge of her nose.She was in a great bit of shock and our first effort was to stop bleeding and restore fluids and get her out of shock and that took the greater part of the night.It was quite apparent that she was seriously injured. We had her on the critical listfor at least a week. "Q. During that time did she suffer pain? A. Yes. She was given sedatives, her blood loss replaced by transfusions and a great bit of sedation was required, both in the form of opiates and phenobarbitals and various sedatives for relief of distress."
Dr. Green testified that Mrs. Fullilove sustained a comminuted fracture of the left arm, the forearm, at the wrist. This bone, he said, was broken into many multiple pieces, because of which it was necessary to put her arm in a splint for immediate partial immobilization. Fourteen days after the accident, Mrs. Fullilove was seen by Dr. King, who said she sustained a severe Colles' fracture of the tip of the ulna extending into the wrist, which was described as a complete fracture and a displacement. An open reduction was performed on the wrist, after which the arm was placed in a cast until August 18, 1958. Eight months following the accident, plaintiff had recovered only 75% of the motion of the arm despite intensive therapy. Dr. King was further of the opinion that she would probably *834 experience degenerative arthritic changes because of this injury.
Relative to the injuries to her face and teeth, Dr. Green testified there were multiple fractures about her face. The nose was broken and the maxilla, the bone in the top of the mouth, was broken off and knocked back, and became avulsed, that is, fragmented. Her physical condition at the time she entered the hospital would not admit of proper procedure to remedy these conditions.
Dr. Isom, who examined Mrs. Fullilove June 30th in a Shreveport hospital, found that she sustained an injury to her upper front teeth which also involved the jawbone. After the administration of an anesthetic, he removed several teeth. Dr. Smith later removed others. Plastic surgery was indicated as a necessity to restore a sunken area under her nose. Dr. Smith corroborated Dr. Isom's testimony and stated several teeth were broken, a few missing completely, and some of the bone was broken and destroyed. Altogether, Mrs. Fullilove lost seven teeth; in another, the nerve was removed, and the condition of two others was doubtful. Appropriate bridge work was required.
Dr. Custer generally corroborated Dr. Isom and Dr. Smith in their findings, and stated there was a deviation in the septum which interfered with her breathing, and indicated that plastic surgery was necessary as well as a bone graft in order to correct disfigurement.
Nothing was done in Ruston concerning Mrs. Fullilove's foot, due to shock or threatened shock. Dr. King testified she received two fractures in the right foot, a small fracture at the joint at the base of the fifth metatarsus, and another of the first cuneiform in her right foot. In connection with treatment, Dr. King placed Mrs. Fullilove in a cast on June 24th and removed it August 18th, at which time she was still suffering pain and swelling in her foot. At least six months' additional time would, in the doctor's opinion, be required before this condition was symptomless.
Dr. King was of the further opinion that Mrs. Fullilove had definitely sustained a rather severe back sprain which he was never able to diagnose positively as an intervertebral disc.
From this, it is established that Mrs. Fullilove sustained two broken bones in her foot; and her nose was bashed in, causing a deviated septum, impairing her breathing. From these injuries and the broken upper jawbone and the teeth destroyed, plaintiff suffered, in addition to pain incidental thereto, disfigurement of her face and nose.
In making an award for damages, consideration must therefore be given to the fact of the broken jaw and nose, the loss of teeth, the disfigurement sustained, the injuries to the hand and foot, and the pain suffered in her back, over a period of at least 18 weeks during which she was unable to resume her normal activities. For these injuries, we think the sum of $22,500 is neither excessive nor inadequate to compensate her. In this connection, it may be pointed out that Mrs. Fullilove was 28 years of age at the time of the accident.
Next for consideration is the quantum of award to Mr. and Mrs. Fullilove for damages on account of the death of their minor son, Ronnie Webb Fullilove. This was the child of Mrs. Fullilove and the adopted child of Mr. Fullilove. He was brought to the hospital in severe shock, showing no external signs of injury but complaining of excessive thirst indicative of the loss of blood through internal hemorrhages. X-rays revealed severe fractures in the area of his pelvis. Notwithstanding the efforts of the doctors in attendance, he was never brought out of shock, and expired in about 50 minutes after his admission to the hospital. Thus, it may be said he lived approximately two hours after the injury. Dr. Green described Ronnie's terrible thirst as very agonizing and said he was in severe shock and intense pain, of which he was *835 conscious until approximately 10 minutes before he died.
This child had been adopted soon after the marriage of Mr. and Mrs. Fullilove. He was a normal boy, athletically inclined, very much attached to the family and they to him. We think an award of $1,000 each is not excessive for the conscious pain and suffering for this approximate two hours, and $10,000 to each of the parents for the untimely loss of their son and his love, affection, and companionship. Himes v. Avinger, La.App. 2d Cir., 1956, 85 So.2d 304.
Fortunately, the 8-year-old minor daughter, Dottie Jean Fullilove, was not too severely injured. She, however, sustained a fracture of the left femur. This was a lineal fracture at the base of the left hip, which healed without displacement of the fragments. After treatment at Ruston, for approximately a week, she was brought to Shreveport and placed under the care of Dr. King. Prior to the time Dr. King saw her, she had been in a wheel chair, but he placed her on crutches for about three weeks. Her recovery has been uneventful and further difficulty is not expected. An award of $1,000 is, in our opinion, adequate for the injuries sustained by the daughter.
Therefore, as against the awards in favor of the aforesaid plaintiffs, there should be credited, by reason of the partial settlement heretofore mentioned, the sum of $4,250 against the claim of Dixie L. Fullilove, $3,000 against the claim of Mrs. Fullilove, and $250 against the claim of Dottie Jean Fullilove.
For the reasons assigned, the judgment appealed is annulled, avoided, reversed and set aside; and
It is now ordered, adjudged and decreed that the exception of no cause and of no right of action be and the same is hereby overruled and, accordingly, there is now judgment in favor of the plaintiff, Dixie L. Fullilove, against the defendant, State of Louisiana, for the full sum of $62,590.24 with legal interest thereon from judicial demand until paid, less a credit of $4,250, and in favor of plaintiff, Mrs. Myrtle Webb Fullilove, against the defendant, State of Louisiana, for the full sum of $33,500, with legal interest thereon from judicial demand until paid, less a credit of $3,000, and in favor of plaintiff, Dixie L. Fullilove, as the father and administrator of the estate of his minor daughter, Dottie Jean Fullilove, against the defendant, State of Louisiana, for the full sum of $1,000, with legal interest thereon from judicial demand until paid, less a credit of $250.
It is further ordered, adjudged and decreed that the defendant is hereby taxed for all costs except such for which it is exempt by law.
Reversed and rendered.