125 So.2d 389 (1960)
240 La. 859
Dixie L. FULLILOVE et al.
v.
U. S. CASUALTY COMPANY OF NEW YORK et al. (Southwestern Fire & Casualty Company).
William C. CALDWELL et al.
v.
U. S. CASUALTY COMPANY OF NEW YORK et al. (Southwestern Fire & Casualty Company).
No. 45280.
Supreme Court of Louisiana.
December 12, 1960.
Rehearing Denied January 9, 1961.
*390 Bienvenu & Culver, P. A. Bienvenu, New Orleans, for defendant and relator.
Jackson B. Davis, Booth, Lockard, Jack, Pleasant & LeSage, Shreveport, Campbell, Campbell & Marvin, Minden, for respondents.
TURNER, Justice.
Plaintiffs, in these consolidated cases, sought to recover damages resulting from an accident which occurred on June 13, 1958, about 10:00 p. m. on U. S. Highway No. 80, approximately one mile east of Choudrant, Lincoln Parish, between a Plymouth car, driven by Buford Caldwell and a Chevrolet car driven by Henderson Jordan who was alone. In the collision, Buford Caldwell, Ronny Webb Fullilove and Henderson Jordan were killed and other occupants of the Plymouth were seriously injured.
The defendants were State of Louisiana through the Department of Public Works, the alleged employer of Henderson Jordan, United States Casualty Co., the automobile liability insurer of the Chevrolet automobile being driven by Henderson Jordan but owned by his son Larry, and Southwestern Fire & Casualty Co., the public liability insurer of a Ford automobile, the family car of Henderson Jordan and his wife, Mrs. Annie Lesba Jordan. The Ford was registered and insured in the name of Mrs. Jordan. Prior to the trial, U. S. Casualty Co. made settlement with the plaintiffs. The State of Louisiana was dismissed from the action after trial as a result of the decision of this Court in Duree v. Maryland Casualty Co., 238 La. 166, 114 So.2d 594. Judgment was rendered in favor of the plaintiffs in the Caldwell suit for $2,500 and in the Fullilove suit for $7,500 against Southwestern Fire & Casualty Co., the liability limits of its policy on the Ford.
Defendant, Southwestern Fire & Casualty Co., appealed to the Court of Appeal, Second Circuit, which affirmed the judgment of the district court. Following the finality of this judgment, Southwestern Fire & Casualty Co. applied here for certiorari. The writs were granted and the case has been argued and submitted for our decision.
All parties to these two suits accept the trial court's findings as to negligence and quantum, the only question to be determined by this court is Southwestern's liability under its policy on the Ford automobile.
The policy, in its insuring clause, recites that the company agrees to pay on behalf of the insured, all sums up to the limits of liability, which the insured shall become legally obligated to pay as damages because of injury or death to others. The policy further provides:
"Persons Insured
"The following are Insureds under Part 1:
"(a) With respect to the owned automobile,
"(1) The named Insured and any resident of the same household,
*391 "(2) Any other person using such automobile, provided the actual use thereof is with the permission of the named insured;
"(b) With respect to a non-owned automobile,
"(1) the named Insured,
"(2) any relative, but only with respect to a private passenger automobile or trailer not regularly furnished for the use of such relative."
It also provides under Definitions, that:
"Under Part 1:
"`named insured' means the individual named in Item 1 of the declarations and also includes his spouse, if a resident of the same household;
"`insured' means a person or organization described under `Persons Insured';
"`relative' means a relative of the named insured who is a resident of the same household;
"`owned automobile' means a private passenger or utility automobile or trailer owned by the named insured, and includes a temporary substitute automobile;
"`temporary substitute automobile' means any automobile or trailer while temporarily used as a substitute for the owned automobile or trailer when withdrawn from normal use because of its breakdown, repair, servicing, loss or destruction;
"`non-owned automobile' means an automobile or trailer not owned by the named insured or any relative, other than a temporary substitute automobile'"
The trial court and the court of appeal found that Larry's Chevrolet was at the time of the accident being used by his father, Henderson Jordan, as a "temporary substitute automobile," as defined in the policy.
The record shows that the Ford described in the policy was the family car, having been purchased with community funds. Henderson Jordan regularly used the Ford, among other uses, for the purpose of making trips in connection with his employment by the Department of Public Works of the State of Louisiana. When her husband was not using the Ford, Mrs. Jordan ordinarily used it for the purpose of going to work in the morning, returning home for lunch, back to work after lunch and home again in the evening. Mr. and Mrs. Jordan's son, Larry, who resided in the household with his parents, owned a Chevrolet automobile which was available to his father on any occasion that he wished to use it without his having to obtain specific permission. It was shown that prior to the day of the accident Mr. Jordan used Larry's car only for short trips in connection with his employment. When Mr. Jordan was using the Ford, Mrs. Jordan and Larry rode to and from work in the Chevrolet. When Mr. Jordan was using the Chevrolet, Mrs. Jordan and Larry used the Ford for that purpose. On the day of the accident, Mrs. Jordan drove to and from work in the Ford.
Also on that day, Mr. Jordan left on a long trip on business for his employer using Larry's Chevrolet. Mr. Jordan did not give any reason for using his son's car on that occasion but it is presumed that he did so because the tires on the Ford were in such poor condition as to make it unsafe to drive a long distance in the Ford as evidence was introduced to show that it would not have been prudent to drive any distance with the tires that were on the Ford at that time. Plaintiffs therefore contend that the Ford had been withdrawn from Henderson Jordan's normal use for long-distance driving because of its breakdown and that the Chevrolet of Larry Jordan became a "temporary substitute automobile," and as such included in the liability coverage of the insurance policy on the Ford.
On the other hand, Southwestern contends that inasmuch as Mrs. Jordan was *392 actually using the insured Ford on the day of the accident in a normal and customary manner, it cannot be said that the car was withdrawn from normal use because of its breakdown.
The terms and definitions of the policy extend coverage to a temporary substitute automobile when the owned automobile is withdrawn from normal use because of any one or more of five causes, viz.: Breakdown, repair, servicing, loss or destruction. The cause claimed here is "breakdown". We think that tires being necessary to the operation of the automobile, "breakdown" occurs when the condition of the tires are such that the automobile is immobilized or unfit for normal use.
Posed for our determination is the question of whether the Ford was withdrawn from normal use because of its breakdown.
The policy before us for interpretation is a fairly new type which provisions have not been litigated before an appellate court in Louisiana prior to this case although its provisions have been considered in other jurisdictions and decided adversely to plaintiffs' position.[1]
Finding that Mr. Jordan's normal use of the Ford was in connection with his work and that due to the condition of the tires the car was incapable of being used for the long trip Mr. Jordan was making at the time of the accident, the court of appeal concluded that the Ford must be considered as having been withdrawn from its regular, customary and normal use by Mr. Jordan and that the Chevrolet was a "temporary substitute automobile" for him as that term is used in the policy.
The court of appeal recognized that its ruling is inconsistent with the cases of Erickson v. Genisot, 322 Mich. 303, 33 N.W. 2d 803, and Service Mutual Insurance Company v. Chambers, Tex.Civ.App., 289 S.W. 2d 949, which hold that withdrawal must be from all normal use.
The court of appeal in arriving at their opinion in this case relied upon two cases. Mid-Continent Casualty Company v. West, Okl., 351 P.2d 398, and the case of Allstate Insurance Company v. Roberts, 156 Cal.App. 2d 755, 320 P.2d 90. We don't believe that these cases support the position relied upon by plaintiff in the instant case. The Oklahoma case is analogous to the present case in many respects but the language of the court indicates that if the facts in that case had been the same as the facts in the instant case their decision would have been a different one. The facts are that Lenard E. Tucker was instructed by his employer to drive to a town some distance away, but the tires on his car were unsafe for a trip of that distance, so he left his car parked (with the keys in it) in front of his father's cafe and borrowed his father's car for the journey. While on the trip Lenard became involved in an accident which killed plaintiff's intestate, and plaintiff sued the liability insurer of Lenard's car on the theory that Lenard was using a temporary substitute automobile. The wording of the policy was identical with that involved in the instant case and the court found that Lenard was covered under the "temporary substitute" clause.
The defendant in the case argued that Lenard's car was not withdrawn from normal use because his father could have used it while Lenard was away. However, the court found that Lenard's car was, in fact, not used, while he was using his father's car, and held as follows [351 P.2d 401]:
"We think the fact that the Buick was not operated while Lenard was *393 driving the substitute Pontiac overshadows the idea that it might, or could, have been operated by Mr. Tucker, and overlooks the important distinction between `normal use' (which means `normal' as pertains to the insured and his customary use of the `described automobile') and `possible' use by someone other than the insured."
It is obvious that the court clearly implied in the foregoing quotation that Lenard's policy would not have covered him if the car which he "withdrew from normal use" had been put to normal use by his father during Lenard's trip.
In the California case Raymond Roberts was having mechanical difficulty with his car. He was to drive some of his wife's relatives to a town some distance away and he did not want to risk the drive in his own car so he parked it in the driveway, left the keys with his wife and used her car for the trip. On the trip Raymond had an accident and plaintiff, who was injured, sued the liability insurer of Raymond's car on the theory that Raymond was driving a "substitute automobile" and should be covered under his own policy. Raymond's insurance policy contained the same language as was found in the present case and the court found coverage saying [156 Cal.App.2d 755, 320 P.2d 92]:
"Nor can we say as a matter of law that the Mercury was not `withdrawn' from normal use because of its `breakdown.' There it stood in the driveway locked and unused during the period of the use of the `substitute' Ford and until taken to a garage for further repair."
The very term "substitute" connotes the replacement of one thing for another. In 83 C.J.S. p. 766 the word "substituted" is defined as follows:
"It has been said that the word `substituted' describes a replacement of one thing by another, and in its ordinary sense and well-known meaning designates something placed in a position previously occupied by another thing, and implies the removal or elimination of the thing replaced, since something cannot be substituted for something else unless that for which the substitution is made is taken out and that which is substituted is inserted in its place." (Emphasis ours.)
Counsel for plaintiffs urges that the particular use Mrs. Jordan made of the car on the day of the accident was not the normal use of the car; that the most which can be said is that her use that day was one of the ways in which the car might normally be utilized but was by no means the allembracive normal use; that a very important use was that to which Mr. Jordan customarily put the vehicle, that is, the making of extended trips for the State; and that this particular implementation was just as important, if not the most important use, to which the vehicle could be placed.
What counsel for plaintiffs overlooks is the fact that the policy states that the car must be withdrawn from normal use, not withdrawn from the most important or primary use. That the purpose for which Mrs. Jordan used the car on the day of the accident was a use to which she regularly and ordinarily put the car is evidenced by her testimony as follows:
"Q. Now, on the day before this accident occurred, you did use your car to go to work. A. Yes.
"Q. And I believe you had it washed and greased on that day? A. The day before the fatal accident, yes.
"Q. The day before, and that was the occasion when you say the tires were examined, is that correct? A. That's correct.
"Q. And you drove your car back home that evening. A. Yes.
"Q. Now, the next day, did you take your car and drive it to work? The day of the accident? A. The day of the accident?
*394 "Q. Yes. A. Yes.
"Q. And did you bring your son to work and then come back to your home and then go back to work. A. Just as the usual routine.
"Q. And you came home for lunch, for dinner and you went back to work after then in the car? A. Yes.
"Q. The car was operating properly, was it not? A. Well, it was all right in a short distance.
"Q. It was mechanically operating A. Yes.
"Q. as well as it ever had, was it not? A. Yes.
"Q. You didn't have any trouble operating it. A. No, I didn't have any trouble on that day.
"Q. I see. Now, you then, at the conclusion of that day drove the car home, is that correct? A. That's right.
"Q. And you followed your usual practice. A. Yes.
"Q. And you used the car in the usual manner, is that right? A. When I came in in the afternoon, the car was in the garage and that was until the next day.
"Q. I say you used the car on that day in the usual way that you had used it in going A. Yes.
"Q. to and from work in the past, isn't that correct? A. Yes.
"Q. And it was functioning properly as far as you could tell by driving it. A. Mechanically, yes, it was.
"Q. The only thing that you knew about A. Was the tires.
"Q. was that somebody had reported to you about the tires, but that did not interfere with your driving or the operation of the automobile, did it? A. No.
"Q. And on the morning of this accident, as I understand it, your husband left early and went outside and got into the Chevrolet automobile without mentioning to you or to your son that he was going to use the Chevrolet automobile. A. That's right.
"Q. And you only learned that he had taken the Chevrolet when you went out to see which car was going to be available A. Was available for us to go to work in."
While it is noted that Mrs. Jordan used the word "usual" in referring to the use of the Ford rather than the word normal, the two words have the same meaning. Webster's International Unabridged Dictionary, 2d Edition defines "usual" as customary, ordinary, habitual and gives as one of its antonyms "abnormal".
The policy in this case is referred to as a family type policy which naturally brings to mind a family type use of the automobile. Of course the primary use of an automobile is a means of conveyance or transportation from one point to another. The family uses of an automobile are many and varied and include all uses to which the family car is normally put such as to and from the grocery store for the family groceries, to and from work when the members of the family have jobs away from their home, to church on Sunday which, of course, comes but once a week, to take vacations which normally come but once a year, to visit friends across town, to attend amusements such as drive-in theatres, athletic contests, etc. All of these uses, in our opinion, constitute the normal use of the family vehicle. We don't think that we can say that when the vehicle was being used for any one of these normal uses that all other uses cease to be the normal use.
In this case it was shown that Mr. Jordan used the family car for long trips when necessary over a long period of time but had ceased to do so presumably because of the poor condition of the tires and the *395 resulting safety element involved. We think it would be more reasonable to say that the long trips by Mr. Jordan in the Ford had ceased to be the normal use, inasmuch as he had not used it for that purpose for some time, while, at the same time and without interruption the family had continued the other normal and usual uses, rather than to say that it had been withdrawn from the normal use. That Mr. Jordan did not make his normal use of the Ford for his extended trip because of the condition of the tires did not, according to her own testimony, prevent Mrs. Jordan from using the vehicle in her normal and customary manner. Thus we conclude that on the day of the accident the Ford had not been withdrawn from normal use and for that reason the Chevrolet could not be considered as a temporary substitute car covered by the liability insurance on the Ford.
For the reasons assigned, the judgments of the Court of Appeal, Second Circuit, and of the district court, are annulled and set aside; and it is now ordered, adjudged and decreed that the plaintiffs' suits be dismissed, at their cost.
HAMITER, Justice (dissenting).
Concededly, the normal use of the insured Ford automobile included its employment by Henderson Jordan for long trips in connection with the duties of his position in the Louisiana Department of Public Works. This being true my view is that at the time of Jordan's accident it (although then being subjected to a limited or restricted use by Mrs. Jordan which is distinguishable from a normal use) was "withdrawn from normal use because of its breakdown" within the meaning and contemplation of the disputed policy provision.
To me it appears that the majority, in reaching the result announced in their opinion, have applied such provision as though it recited that a temporary substitute automobile means any automobile while temporarily used as a substitute for the owned automobile when "withdrawn from use" or "when withdrawn from all normal use". In other words the provision has been applied herein after either the deletion therefrom of the word "normal" or the addition thereto of the word "all". And thus a material and unauthorized change in the policy's language has been judicially effected, for "withdrawn from normal use" (as therein recited) clearly connotes something entirely different from "withdrawn from all normal use" or "withdrawn from use".
Additionally, I am unable to agree with the majority's view that the holding in Mid-Continent Casualty Company v. West, Okl., 351 P.2d 398, 400, is not authority for the interpretation urged by the plaintiffs. Of course, that case is merely persuasive, not controlling, here. However, the following pronouncements contained in the opinion thereof, with which I am in complete agreement, indicate the conclusion of the court respecting its construction of the disputed clause which is identical to the one involved here: "* * * In our opinion, the evidence showing that it would have been possible to use said auto, equipped with the old tires, for short trips in Temple is not of controlling significance. It is a matter of common knowledge that there is a difference in the dangers involved in using badly worn tires for that kind of driving and in using them on a long trip at sustained high speeds, especially in hot weather like existed at the time of Lenard's proposed trip to Oklahoma City. Under the reasonable and liberal interpretation that must be given the `temporary Substitute automobile' provision, its wording does not mean that the insured's own car, or the `described automobile', must be disabled from all use. * * * It says only: `* * * while withdrawn from normal use * * *'. It is not disputed that the insured's `normal' use included out-of-town, as well as in-town trips. Therefore, if the Buick was dangerous and disabled for trips which Lenard customarily made in it, like the one in question, we think it was disabled for his `normal use', within the meaning of that term in the quoted provisions; and we so hold."
*396 Accordingly, I am of the opinion that the judgments of the Court of Appeal in the above entitled causes should be affirmed.
SANDERS, Justice (dissenting).
These suits involve the interpretation of a Family Automobile Liability Insurance Policy. This is a relatively new type of policy. The pertinent provisions have not been construed by the appellate courts of this state prior to the decision by the Court of Appeal in the instant cases. There is also a paucity of jurisprudence on the precise legal question here presented in other states. Therefore, this case is attended with unusual significance in the development of the sociolegal pattern of current jurisprudence.
The practical effect of this Court's decision, as I view it, is to require that the owned and insured automobile be withdrawn from all use before coverage is afforded to a "temporary substitute automobile" under the provisions of the policy. To this holding, I cannot subscribe, since, in my opinion, it is in conflict with the terms of the policy which require a withdrawal from "normal use" only.
The policy of insurance on the Ford automobile contains the following provisions which are pertinent to a decision in this case:
"* * * `owned automobile' means a private passenger or utility automobile or trailer owned by the named Insured, and includes a temporary substitute automobile;
"`temporary substitute automobile', means any automobile or trailer while temporarily used as a substitute for the owned automobile or trailer when withdrawn from normal use because of its breakdown, repair, servicing, loss or destruction; * * *."
By the terms of the policy, two requirements must be met herein to warrant the imposition of liability on the insurer for damages arising from the temporary use by the insured of the substituted automobile:
(1) The owned automobile must have been withdrawn from normal use; and
(2) The withdrawal of the owned automobile must have been caused by a breakdown.
The plaintiffs contend that the Ford had been withdrawn from normal use because of its breakdown, namely, worn and gashed tires; and that, therefore, the Chevrolet was a temporary substitute automobile within the terms of the policy.
The defendant contends that inasmuch as the Ford was actually used by Mrs. Jordan on the day of the accident to go to and from work and was not withdrawn "from use", the Chevrolet was not a temporary substitute automobile. Hence, it concludes, there was no insurance coverage. The defendant asserts that the policy was not intended to cover the "operation of two automobiles by members of the same household" simultaneously.
Squarely posed for decision is the question of whether or not the Ford automobile was withdrawn from normal use because of its breakdown.
In construing an insurance contract, courts are not authorized to add or detract from its language. Muse v. Metropolitan Life Ins. Co., 193 La. 605, 192 So. 72, 125 A.L.R. 1075; Edwards v. Life & Casualty Ins. Co. of Tennessee, 210 La. 1024, 29 So.2d 50; Hemel v. State Farm Mutual Auto Insurance Company, 211 La. 95, 29 So.2d 483; Oil Well Supply Co. v. New York Life Ins. Co., 214 La. 772, 38 So.2d 777; Albritton v. Fireman's Fund Ins. Co., 224 La. 522, 70 So.2d 111; Monteleone v. American Employers' Insurance Co., 239 La. 773, 120 So.2d 70.
In the Muse case, cited supra, this Court declined to add or delete words in the insurance policy to reach a conclusion favorable to the insured and stated [193 La. 605, 192 So. 75]:
"In the absence of statutory provisions to the contrary, insurance companies *397 have the same right as individuals to limit their liability, and to impose whatever conditions they please upon their obligations not inconsistent with public policy; and the courts have no right to add anything to their contracts, or to take anything from them."
Under familiar rules of construction, if the language of an insurance policy is ambiguous, it must be construed in favor of the insured and against the insurer. The court must adopt the interpretation most favorable to the insured, since the insurer is the author of the contract. LSA-Civil Code, Article 1957; Muse v. Metropolitan Life Ins. Co., supra; Salomon v. Equitable Life Assur. Soc. of U. S., 202 La. 1001, 13 So.2d 329; Hemel v. State Farm Mutual Auto Insurance Company, supra; Stanley v. Cryer Drilling Co., 213 La. 980, 36 So.2d 9; Oil Well Supply Co. v. New York Life Ins. Co., supra; Moll v. Mutual Health Ben. & Acc. Ass'n, 223 La. 511, 66 So.2d 320; Albritton v. Fireman's Fund Ins. Co., supra; Monteleone v. American Employers Insurance Co., supra.
The provision for coverage of a substituted vehicle is for the benefit of the insured, and, if any construction is required, it is to be construed liberally in his favor. Farley v. American Automobile Insurance Company, 137 W.Va. 455, 72 S.E.2d 520, 34 A.L.R.2d 933; Allstate Insurance Company v. Roberts, 156 Cal.App.2d 755, 320 P.2d 90. Its purpose is not to narrowly limit or defeat coverage but rather to extend it automatically to protect the insured when he uses a substitute automobile temporarily because of the withdrawal of the regular vehicle for a reasonable cause set forth in the policy. Allstate Insurance Company v. Roberts, supra; Lewis v. Bradley, 7 Wis.2d 586, 97 N.W.2d 408; Lloyds America v. Ferguson, 5 Cir., 116 F.2d 920. The phrase, "normal use", as employed in the substitution provision denotes use which is normal as pertains to the insured. Mid-Continent Casualty Company v. West, Okl., 351 P.2d 398.
The majority opinion construes the word normal in the policy as having "the same meaning" as "usual." Finding that the use of the Ford by Mrs. Jordan for conveyance to her work was usual (when her husband was not driving it in his employment), the Court concludes that the automobile was in normal use. Therein lies the fallacy of the decision.
In this connection, the etymological development of the word normal is both relevant and illuminating. The word is derived from the Latin norma, which is defined as a carpenter's square for measuring right angles. In figurative usage, it means rule, standard, precept, or model. Cassell's New Latin Dictionary. New York, Funk & Wagnalls Company, 1959; The Classic Latin Dictionary. New York, Hinds, Noble and Eldredge, n. d.; Webster's New International Dictionary of the English Language. Springfield, Mass., G. & C. Merriam Company, Second Edition, 1939. The Latin word passed into our language in the noun norm which has as its primary meaning: a rule or authoritative standard; model; type; pattern. Webster's New International Dictionary of the English Language, supra. Normal is that which corresponds to the norm or general standard of which every member of its class should be capable. Crabb's English Synonyms. New York, Harper and Brothers, Revised Edition, 1945, p. 523, normal. As stated in Webster's Dictionary of Synonyms,[1]
`a person or thing is normal (opposed to abnormal or exceptional) that does not deviate in any marked way from what has been discovered or established as the norm * * * for one of its kind * * *."
While normal and usual are sometimes treated as synonyms, they are at most analogous words with different meanings. *398 See Usual, Webster's Dictionary of Synonyms, p. 864. The distinction between these terms is primarily, although not exclusively, one of breadth and range of application. Usual has the connotation of habitual or customary. As such, it may characterize a plurality of the uses of an automobile. On the other hand, the phrase "normal use" is all-embracive: it refers to the total pattern of the varied uses of the automobile by the insured. It includes the long as well as the short trips of the insured.
Contextually, in the insurance contract, normal use can best be defined as that use which when taken as a complete pattern, or as a totality, attains the norm, or standard, for automobiles generally. When the phrase is thus defined in the light of its etymology and context, the conclusion is inescapable that the Ford automobile, restricted as it was to short distances, was not in normal use on the day of the accident. The lame saddle horse which is ridden by the farmer's son to the cross-road store but which cannot be used to round up the herd of Brahman cattle in the far pasture is not in normal use.
Insofar as I can determine, there are only five cases in the jurisprudence which approximate the factual matrix in the cases at bar: Erickson v. Genisot, 322 Mich. 303, 33 N.W.2d 803; Service Mutual Insurance Company of Texas v. Chambers, Tex.Civ. App., 289 S.W.2d 949; Lewis v. Bradley, supra; Allstate Insurance Company v. Roberts, supra; Mid-Continent Casualty Company v. West, supra.
In the Erickson and Service Mutual Insurance Company cases, the courts, apparently construing the word normal in the sense of usual or customary, held that the withdrawal must be from all normal use. This construction, it will be noted, adds the word all to the policy provision and thereby brings about an attenuation of meaning. The Allstate and Mid-Continent Casualty cases correctly apply the policy provision to the factual situations with which the courts were there concerned, which involved no actual use of the withdrawn automobile. In the latter case, the Supreme Court of Oklahoma, very appropriately, stated:
"In our opinion, the evidence showing that it would have been possible to use said auto, equipped with the old tires, for short trips in Temple is not of controlling significance. It is a matter of common knowledge that there is a difference in the dangers involved in using badly worn tires for that kind of driving and in using them on a long trip at sustained high speeds, especially in hot weather like existed at the time of Lenard's proposed trip to Oklahoma City. Under the reasonable and liberal interpretation that must be given the `temporary Substitute automobile' provision, its wording does not mean that the insured's own car, or the `described automobile', must be disabled from all use. (See Allstate Ins. Co. v. Roberts, 156 Cal.App.2d 755, 320 P.2d 90, 91, 92, in which the court recognized that such provision may contemplate withdrawal from normal use of an auto whose use for an out-of-town trip, might be `imprudent', as distinguished from impossible). It says only: `* * when withdrawn from normal use * * *'. It is not disputed that the insured's `normal' use included out-of-town, as well as in-town trips. Therefore, if the Buick was dangerous and disabled for trips which Lenard customarily made in it, like the one in question, we think it was disabled for his `normal use', within the meaning of that term in the quoted provisions; and we so hold."
A contrary interpretation of the policy provision renders the insurance coverage indefinite and uncertain to the real prejudice of the insured. For illustration, it can easily be postulated that an insured has left both his keys and partially disabled automobile at his residence. He departs on an extended trip in a borrowed vehicle. After his departure, and obviously without his knowledge, his son drives the automobile on *399 errands to the grocery store. With the first turn of the wheels on the automobile left behind, the vehicle driven by the insured is stripped of liability coverage. This is reductio ad absurdum. Such an unusual result could not have been intended under the policy.
It has been strenuously urged that the policy was never intended to provide an umbrella of insurance for two vehicles at the same time. There is nothing in its provisions which excludes multiple coverage. Moreover, it is clear that such coverage is consonant with the terms of the policy under appropriate circumstances.
It must be concluded that the Ford automobile of the insured which could not be used by him for the extended trip because of thin and gashed tires was withdrawn from normal use because of a breakdown, notwithstanding the fact that it was used by his wife as a conveyance to and from her employment.
In my opinion, the judgment of the Court of Appeal in favor of the plaintiffs should be affirmed. I respectfully dissent.
NOTES
[1] Pennsylvania T. & F. Mut. Cas. Ins. Co. v. Robertson, 4 Cir., 259 F.2d 389; Iowa Mutual Insurance Company v. Addy, 132 Colo. 202, 286 P.2d 622; State Farm Mutual Automobile Insurance Company v. Bass, 192 Tenn. 558, 241 S.W.2d 568; Western Casualty & Surety Company v. Norman, 5 Cir., 197 F.2d 67; Lloyds America v. Ferguson, 5 Cir., 116 F.2d 920; Allstate Insurance Company v. Roberts, 156 Cal.App.2d 755, 320 P. 2d 90; Ransom v. Fidelity & Casualty Co., 250 N.C. 60, 108 S.E.2d 22.
[1] Webster's Dictionary of Synonyms. Springfield, Mass., G. & C. Merriam Co., First Edition, 1951, p. 689, Regular.