229 So.2d 104

**Paul NORMAND and Mrs. Thomasine K. Normand**

**v.**

**HERTZ CORPORATION, Royal Indemnity Company and Southeastern Fire Insurance Company.**

**No. 49416.**

Nov. 10, 1969.

Rehearing Denied Dec. 15, 1969.

White & May, Baton Rouge, for plaintiffs-applicants.

Percy, Macmurdo & Gray, Sanders, Miller, Downing & Kean, Baton Rouge, for defendants-respondents.

SUMMERS, Justice.

This is a tort action to recover damages for death, personal injuries and property damage arising out of an automobile collision. Suit was instituted by plaintiff Paul Normand, individually and as administrator of the estates of his minor children, John Scott Normand and Myra Normand, and by his wife, Mrs. Thomasine K. Normand, against Southeastern Fire Insurance Company, the public liability insurer of Arthur G. Hatcher, and Hertz Corporation and its liability insurer Royal Indemnity Company jointly and in solido.

Paul Normand claims $50,000 for the loss of his child Colleen Normand, who was killed in the accident; $25,000 for injuries, pain and suffering on behalf of his child John Scott; $10,000 for injuries, pain and suffering on behalf of his child Myra and $15,008.61 for special damages.

Mrs. Normand claims $60,000 for her injuries, suffering, future disability and scars, plus the sum of $50,000 for the loss of her minor child Colleen Normand.

Awards were granted by the trial court against Southeastern Fire Insurance Company in favor of all plaintiffs. The claims against Hertz Corporation and Royal Indemnity Company were denied. On appeal to the First Circuit the judgment against Southeastern Fire Insurance Company was reversed, but the trial court judgment was otherwise affirmed. As a consequence, all claims of the plaintiffs stand rejected. They applied for certiorari to review this judgment, and we granted the writ. Third party demands filed by all defendants against Earl Edward Hamilton, his employer, T. E. Mercer Trucking Company, and Mercer's liability insurer, Transport Insurance Company, were denied by the trial court and are not before us.

I.

Shortly before one o'clock on the afternoon of August 14, 1964, plaintiff Mrs. Thomasine K. Normand was en route from her residence on the Airline Highway near Baton Rouge to the home of her mother in Lettsworth, Louisiana. Her children Colleen Ann, age 14, John Scott, age 2, and Myra, age 1, were with her. She was driving a Valiant station wagon in a westerly direction on Louisiana Highway 190, a four-lane highway with a raised dividing strip.

At a point west of Baton Rouge Mrs. Normand pulled into the left-hand lane to pass a truck loaded with pipe belonging to T. E. Mercer Trucking Company and driven by Earl Edward Hamilton. Just as she passed the truck, she beheld a Ford

automobile coming from the opposite direction in the eastbound lanes. The Ford swerved, jumped the center strip and crashed into her station wagon. The driver of the truck she had just passed, being unable to avoid the Ford and station wagon, which were brought to a standstill by the collision, sideswiped the Ford and ran off the highway to the right. Arthur G. Hatcher and Elgie Hay were riding in the Ford at the time, with Hay driving. As a result of the collision between the Ford and the station wagon, Colleen Ann and Hatcher were killed. Hay, Mrs. Normand, John Scott and Myra received serious injuries.

■ The Ford driven by Hay had been rented by Hatcher on August 5, 1964 from the Hertz Corporation in Baton Rouge. On the day of the accident, Hatcher and his companion Hay had been drinking for many hours, at least since before three o'clock that morning. Because of Hatcher's more advanced state of intoxication, Hay was driving the car at the time of the accident. Tests conducted on blood obtained from Hatcher's body soon after the accident disclosed that it contained twenty percent alcohol, while Hay's blood contained twelve percent alcohol. Testimony of the chemist with the State Crime Laboratory was to the effect that these tests established that Hatcher was drunk, whereas the twelve percent alcoholic content of Hay's blood indicated that his state of intoxication may have been less than full drunkenness, fifteen percent being the approximate cut off between drunkenness and a lesser state of intoxication.

From these facts we conclude that the sole proximate cause of the accident, and the death, injuries and damages resulting therefrom, was the joint and concurring negligence, imprudence and want of care of Hatcher and Hay. Hatcher's negligence consisted of his imprudence and want of care in drinking excessively and making his rented automobile available to Hay who was also drinking and under the influence of liquor; whereas Hay's negligence consisted of driving while under the influence of alcohol, and losing control of the Ford automobile. Jones v. Continental Casualty Co. of Chicago, Ill., 246 La. 921, 169 So.2d 50 (1964); Mercier v. Fidelity & Casualty Co. of New York, 10 So.2d 262 (La.App.1942).

II.

The claim against Southeastern Fire Insurance Company is based upon the fact that at the time of this accident Hatcher was the owner of a 1963 Mercury automobile insured under a family automobile liability policy issued by Southeastern. Plaintiffs assert that under this policy the Ford rented from Hertz is a "temporary substitute automobile", and as such it is insured while driven by Hay with Hatcher's permission.

Southeastern's policy insured Hatcher, or persons driving with his permission, against liability for damages incurred by others arising out of the ownership, maintenance or use of an "owned automobile". "Owned automobile" included a "temporary substitute automobile", defined in the policy as

> any automobile or trailer, not owned by the named insured, while temporarily used with the permission of the owner as a substitute for the owned automobile or trailer when withdrawn from normal use because of its breakdown, repair, servicing, loss or destruction.

■ ▇ Plaintiffs support their contention that the Hertz Ford driven by Hay was a temporary substitute automobile within the policy definition, with these facts: Mae Rosamond was called as a witness by plaintiffs. She testified she had lived with Hatcher as his wife since 1957. According to her testimony, Hatcher owned two vehicles, the 1963 Mercury and a pick-up truck. The Mercury was generally used by both of them as the family automobile, while the pick-up truck was used by Hatcher to go to and from work and when they went fishing.

On August 2 the Mercury was in running condition and in good order, although the hood had been torn off some time before. On this day, because Hatcher had been drinking for days, and to make the Mercury less accessible to him, Mae Rosamond drove it to the home of their friends, Mr. & Mrs. Elwood Smith, some distance away on Florida Avenue, where it was stored. Hatcher knew this. He also had a key to the Mercury, and, except for the inconvenience resulting from the Mercury being stored at a distance from his residence, there was nothing to prevent Hatcher from using it during this time. Nevertheless, he did not use it; and several days later, on August 5, Hatcher rented the Ford from Hertz, telling Mae Rosamond that his "insurance" would pay the rent because the Mercury's hood had to be replaced.

Mae Rosamond stated on several occasions in her testimony that the Mercury was in good running order both prior to and at the time when she drove it to the Smith residence. Engine parts which would be affected by exposure had been wrapped in tinfoil by Hatcher, permitting the car to be driven without a hood. Mrs. Smith corroborates the fact that the Mercury was in running condition when it arrived at her house. While the Mercury was there, both she and her husband drove it on occasions to and from the mailbox a quarter of a mile away. They did this without leaving their property. She summarized her testimony by saying the car was in "perfect" running order.

Two questions are posed under the facts of this case which require determination under the terms of the "temporary substitute automobile" clause of the policy.

First, was the owned automobile (1963 Mercury), insured under the policy, withdrawn from normal use; and, secondly, if withdrawn from normal use, did the withdrawal and rental of the Ford take place because of "breakdown, repair, servicing, loss or destruction" as the policy very plainly provides? Since both of these questions must be answered in the affirmative for plaintiffs to recover, and because we conclude that the Mercury was not withdrawn from normal use, and the Hertz Ford was not substituted or used because the withdrawal was due to "breakdown, repair, servicing, loss or destruction" of the Mercury, plaintiffs cannot recover against Southeastern.

The evidence before us, principally from plaintiffs' own witnesses, does not support their contention, as our statement of the facts demonstrates. It may perhaps be gleaned from the evidence that Hatcher felt that his "insurance" (probably collision insurer) would pay for the rental of another car until the hood was replaced on the Mercury, but even this is not satisfactorily established with that preponderance of evidence which the law requires. Moreover, if Hatcher believed this to be a fact, we can only say that his belief or the existence of this fact does not establish that the Mercury was "withdrawn from normal use" because of "breakdown, repair, servicing, loss or destruction" within the contemplation of the policy's "temporary substitute" provisions. If the Hertz car had been rented because the Mercury was withdrawn from normal use while the hood was being replaced because of a breakdown, a different case would be presented. Pennsylvania Threshermen & Farmers' Mutual Casualty Insurance Company v. Robertson, 4 Cir., 259 F.2d 389 (1958).

■ In these cases, the parties claiming the benefit of coverage must bear the burden of establishing the facts to support their claim by a preponderance of evidence. This means that the burden here was on the plaintiffs. They have failed to discharge that burden with the degree of certainty which the law requires. Fullilove v. United States Casualty Company of New York, 240 La. 859, 125 So.2d 389 (1961). In Western Casualty & Surety Co. v. Norman, 197 F.2d 67 (5 Cir. 1952) the court declared:

Under the policy the fact of substitution was essential to extend coverage. To authorize such extension the party claiming it should, (certainly when in his power, as here), adduce testimony which is sufficient to show, not only that the insured vehicle had been withdrawn from service because of a breakdown, but also that except for this the insured car would have been in use at the time and in the circumstances involved. Such a showing is necessary to establish "temporary use

as a substitute", i.e., a car put in place of another.

As we view the limited evidence in the record, Hatcher had been drinking heavily for some time after his return from a construction job at Guantanamo Bay, Cuba, where he worked for the Navy. To make it more difficult for him to go out and do more drinking, Mae Rosamond stored their car with friends some distance away. But because Hatcher had a key, knew where the car was and could use it, it was not "withdrawn from normal use" within the meaning of that term as used in a family automobile policy. Particularly, it was not withdrawn because of "breakdown", as the policy requires; for the car, although without a hood, was entirely operative. It was not stored in a place for repair, but at the home of friends who drove it. They were not only unable to repair the hood, they had no intention of doing so. Fullilove v. United States Casualty Company of New York, supra; Note, 21 Tul.L. Rev. 835 (1961); Smith, The Work of the Louisiana Supreme Court for the 1960–61 Term—Insurance, 22 La.L.Rev. 347 (1962).

We agree that the claims against Southeastern were properly rejected.

### III.

The liability policy issued by Royal to Hertz provides coverage for Hertz as the named insured and, by endorsement, persons who are parties to agency agreements with Hertz for the purpose of renting automobiles. The word "insured" is defined by the policy to mean the named insured and "any person while using the automobile and any person * * * legally responsible for the use thereof, provided the actual use * * * is by the named insured or such spouse *or with the permission of either*." (Emphasis added.)

Hertz rented the Ford to Hatcher by a rental agreement which provided:

Under no circumstances shall vehicle be used, operated or driven: * * * (E) by any person except (1) Customer; or (2) if a qualified licensed driver, and provided Customer's permission be first obtained, (a) a member of Customer's immediate family, (b) Customer's employer, or (c) an employee of Customer in the course of such employee's regular and usual employment by Customer. * * *

The permission granted by the named insured (Hertz) to its customer (Hatcher) to use, operate or drive the rented vehicle was conditioned upon the restrictions contained in the quoted provision of the rental agreement. Hertz, in effect, gave Hatcher qualified permission, qualified to the extent that the vehicle could not be used, operated or driven by any person except "customer" (Hatcher), or other specified classes of persons with Hatcher's permission. Hatcher's companion Hay came under none of the classes of persons

who were permitted to use, operate or drive the rented vehicle under any circumstances.

■ As used in the rental agreement, the clause which restricted the use, operation or driving of the car to the customer, or certain persons who had obtained his permission, had the effect of restricting the right to actually drive the car to the customer, or the limited class of persons to whom he could grant permission for the use of the vehicle. "Used, operated or driven", as used in the rental agreement, are employed in a restrictive sense. The verbs "used, operated or driven" have an overlapping meaning and draw import from the context. "Used", like "operated" or "driven", signifies a personal act in working the mechanism of the motor vehicle.

■ The sum and substance of our view of the policy, the rental agreement and the facts of the case, assuming that Hay had Hatcher's express or implied permission to drive the Hertz car, is: When Hay drove the car, the operation and driving of the car exceeded the qualified permission extended by the named insured (Hertz) to the customer (Hatcher). For that reason the liability coverage did not apply. That is, since the permission to drive the car, granted by Hertz to Hatcher, expressly excluded such persons as Hay, liability coverage could not be afforded for Hay's negligent driving. Faced with a somewhat

similar provision in another case, we said, "The result sought by counsel * * * would do violence to the provisions of the policy, which are clear and unambiguous." Rogillio v. Cazedessus, 241 La. 186, 127 So. 2d 734 (1961).

IV.

■ As an alternate contention, it is asserted that the lease agreement from Hertz to Hatcher, containing the quoted clause limiting the use, operation or driving of the rented Ford, is an attempt by Hertz to control the extent of the coverage under the policy by stipulations outside the policy itself. Plaintiffs say such a stipulation is ineffectual because it is in violation of Section 624 of Title 22 of the Revised Statutes which provides that "The written instrument, in which a contract of insurance is set forth, is the policy." and Section 628 of the same title to the effect that "No agreement in conflict with, modifying, or extending the coverage of any contract of insurance shall be valid unless in writing and made a part of the policy."

In our view the stipulation in the rental agreement does not conflict with, modify or extend the coverage of the policy. Simply stated, the clause defines the nature and limits of the permission which Hertz, as the insured, extended to Hatcher, its customer. And, since the policy contemplates that the insured could grant permission to others to use and drive the au-

tomobile, the cited statutes are not violated if the nature, extent and conditions of that permission are preserved in contractual form. The restriction on use contained in the rental agreement is, moreover, a condition which Hertz as lessor was at liberty to impose in its contract of lease for the protection of its property.

### V.

■ Plaintiffs have argued that the quoted clause is in small print on the back side of the rental agreement, and for that reason the court should reform the contract and refuse to give the clause effect. The rental agreement is contained on one page, the front consisting of blanks filled in by the Hertz agent with pen and ink, supplying such information as the name of the lessee, his address and driver's license number, a description of the rented car and other data which vary with each transaction. All of the detailed terms and conditions of the contract, however, are printed in small type on the reverse of the one-page agreement. The disputed clause is part of those terms and conditions printed in the same type.

If the court should reform the contract and disregard that clause because it is in small type, it may for the same reason reform any of the other printed terms and conditions of the contract and disregard all of the terms and conditions under which

the parties entered into this transaction, a result clearly incompatible with sound principles of law relating to the interpretation of contracts. The controverted clause is not deceptive or misleading solely because it is in small print when all other terms and conditions are in the same type. The disputed clause is no less prominent than other clauses of the contract. In cases such as this, decisions of this court have announced the law to be: If a party can read, it behooves him to examine an instrument before signing it; and if he cannot read, it behooves him to have the instrument read to him and listen attentively whilst this is being done. Murphy v. Hussey, 117 La. 390, 399, 41 So. 692 (1906). Any other rule would derogate from the settled law and seriously impair the reliability of written contracts upon which the economy and commerce of this State, like others, depend in large measure.

### VI.

■ As noted, the omnibus coverage in Royal's policy defined the unqualified word "insured" as the named insured (Hertz) and also "any person while *using* the automobile and any person * * * *legally responsible for the use thereof* provided the actual use * * * is by the named insured or such spouse or with the permission of either." (Emphasis added.) Relying upon this language of the policy, plaintiffs argue that in spite of the fact

that the rental agreement clause may have excluded coverage because of Hay's negligence while Hay was driving in violation of that agreement, that clause could have no effect upon Hatcher as a "user" and as one "legally responsible for the use thereof." Hatcher, it is argued, as lessee and original permittee from Hertz under the rental agreement, was "using" the car at the time of the accident by riding as a passenger on the front seat while the car was en route to Baton Rouge where it would be returned to the Hertz office. The implication suggested by the fact that the rented car would in time be returned to the Hertz office in Baton Rouge is that both the insurer and the insured were benefitted by the use being made of the car at the time of the accident. And, for this reason, the use was with the permission of the insured. Likewise, plaintiffs assert, Hatcher, as lessee, was in possession of the car and "legally responsible for its use." Thus, the argument concludes, under the omnibus clause Hatcher was an "insured", and the damages caused by his negligence as distinguished from Hay's negligence must be discharged by the insurer, Royal.

This argument disregards the fact that use of the car is required by the policy to be with the permission of the named insured. Hatcher was not "using" the car with the permission of the named insured; he had exceeded his permission, for he violated the authorization in the rental contract by permitting the car to be driven by one who was expressly prohibited from driving. In like manner Hatcher was not "legally responsible for the use thereof" because he had exceeded his authorization, and, by the policy terms, his use was illegal at the time of the accident. In other words, he was not "legally responsible for the use thereof * * * with the permission" of the named insured, and, in our opinion, the facts of this case do not warrant an implied permission.

For the reasons assigned, the judgment of the Court of Appeal is affirmed at plaintiffs' costs.