NORTH DAKOTA MINERAL
INTERESTS, INC., Plaintiff
and Appellant,

v.

Kenny BERGER, Defendant
and Appellee,

and

Saul Azar, Intervenor Defendant
and Appellee.

Civ. No. 920371.

Supreme Court of North Dakota.

Dec. 2, 1993.

Michael J. Maus (argued), of Howe, Hardy, Galloway & Maus, PC, Dickinson, for plaintiff and appellant.

Rauleigh D. Robinson (argued), Bismarck, for defendant and appellee Kenny Berger. Appearance by defendant and appellee Kenny Berger.

Ross H. Espeseth (argued), Bismarck, for intervenor defendant and appellee Saul Azar.

MESCHKE, Justice.

This is a dispute over the proceeds from the sale of a Smaco pumping unit, a cement pad, a horizontal treater, and a fiberglass tank removed from the Andrew Heiser # 1 oil well site in Dunn County. North Dakota Mineral Interests, Inc. [Mineral], appeals from a judgment awarding the first $7,960.75 in sale proceeds to Kenny Berger to pay his lien and dividing the remaining proceeds equally between Mineral and Saul Azar. We affirm in part, reverse in part, and remand with directions.

During the 1980s, Great Plains Petroleum, Inc. [Petroleum], whose president and sole shareholder was Thomas Haugen, had a substantial interest in, and operated, the Heiser well. Petroleum filed for bankruptcy in 1986. In July 1989, Petroleum's bankruptcy trustee conveyed Petroleum's interest in the Heiser well and other wells to Great Dakota Oil Company [Dakota], whose principal stockholder and president was Saul Azar. The "Conveyance, Assignment and Bill of Sale" also granted Dakota 100 percent of Petroleum's interest "in all personal property . . . now or hereafter located on or under any of the oil, gas and disposal properties . . .

including ... all ... replacements thereof and to include, without limiting the language of this paragraph, the personal property specifically described in Exhibit 'B' attached hereto...." Exhibit B described the personal property that was then located on the Heiser well as follows:

4—400 bbl. steel internally coated tanks;

1—400 bbl. fiberglass tank;

1—6 × 15 horizontal treater;

1—M912D pumping unit w/100 hp. electric motor—9000 feet of 2⅜ tbg.—9000 feet of sucker rods;

1—Sucker rod pump; and

Miscellaneous valves, fittings.

According to the parties, the "M912D pumping unit" refers to a Lufkin pumping unit. In August 1989, Dakota hired Thomas A. Haugen Operating Company [Operating] to operate the wells, including the Heiser. Later that month, Operating purchased a fiberglass tank from Mor–Tech–Fab for use on the Heiser well. Operating received an invoice for the purchase of the tank.

In July 1990, Operating agreed with Sun Well Service, Inc. [Sun] that Sun remove the Lufkin pumping unit from the Heiser well and replace it with the smaller Smaco pumping unit in dispute here. According to Haugen, the Lufkin unit "was causing mechanical problems" at the Heiser well, and no one was reimbursing him for the expenses on the well. Haugen testified that replacing the Lufkin unit with the smaller Smaco unit was necessary to put "the well ... back in operation." According to Haugen, because of a lack of operating capital from the mineral interest owners, he allowed Sun to keep the more expensive Lufkin unit in consideration for its services in exchanging the pumps. Sun gave Operating a bill of sale for the Smaco pumping unit.

In July 1991, Azar, on behalf of Dakota, contacted Berger, who runs an oil field service and trucking business, and instructed him to disassemble the equipment on the Heiser well and to haul the equipment to Berger's place of business in Dickinson. According to Berger, after he arrived at the well, Andrew Heiser, the landowner, appeared and

locked the gate on us. He says they were using that for dumping from other locations. Tom is hauling garbage into that place. This is like a dump yard. He said, "I'd like to have this place cleaned up," ...

It was like a garbage dump out there. Berger told Azar what had happened and that Berger could not do all of this work for the originally agreed price. According to Berger, Azar instructed him to " '[g]et it done to please the guy.' " Berger cleaned up the well site, dismantled the equipment, and took the property disputed in this case to his place of business.

Mineral entered this sour drama on October 25, 1991, when it advanced Operating $47,000 in an attempt to purchase the Signalness oil well. Operating agreed to deliver certain oil field equipment to Mineral if Operating could not give Mineral clear title to the Signalness well. Mineral's president, George Childress, went with Haugen to Berger's yard to view the equipment. Childress did not question why Berger had possession of the equipment, but did contact Sun to confirm that Haugen and Operating had title to the equipment. Childress learned that Sun had given Haugen a bill of sale for the Smaco pumping unit, and Haugen showed Childress a receipt from Mor–Tech–Fab for the tank. Operating was unable to provide clear title to the Signalness well, and on December 16, 1991, Haugen and Operating gave bills of sale to Mineral for the Smaco pumping unit, cement pad, horizontal treater, and fiberglass tank located in Berger's yard.

After receiving those bills of sale, Mineral attempted to take possession of the equipment, but Berger refused to allow Mineral possession because he had not been paid for his work on the Heiser well. Berger claimed a lien on the equipment for the work performed.

In December 1991, Mineral sued Berger to recover the equipment. Berger counterclaimed, asserting a repairman's lien on the equipment. The trial court, however, refused to allow Berger to serve a third-party complaint on Azar. In May 1992, Berger assigned his interest in the repairman's lien to GL Trucking & Rental, Inc. [Trucking]. Mineral moved to join Trucking as an addi-

tional defendant, but this was denied by the trial court.

Meanwhile, Dakota filed for bankruptcy. In August 1992, Azar, in his personal capacity, purchased Dakota's interest in the Heiser well and other wells from Dakota's bankruptcy trustee. This "Conveyance, Assignment and Bill of Sale" was virtually identical to the document conveying Petroleum's interest "in all personal property ... now or hereafter located on or under any of the oil, gas and disposal properties ... including ... all ... replacements thereof ..." to Dakota. An attached exhibit described the personal property on the Heiser well in the exact language as the earlier conveyance from Petroleum's bankruptcy trustee, describing the larger Lufkin pumping unit, rather than the smaller Smaco pumping unit. When Azar purchased the Heiser well from Dakota's bankruptcy trustee, none of the equipment was at the well, but instead was located in Berger's yard.

Between the first day and the second day of trial almost one month later, the trial court allowed Azar to intervene over Mineral's objection. Azar asserted that he, rather than Mineral, was the owner of the disputed equipment in Berger's yard because he had purchased it from Dakota's bankruptcy trustee.

The trial court found that Berger, Mineral and Azar each had "weak claims" to the equipment in Berger's yard. Realizing that its "decision is not legally perfect," the court attempted to arrive at a resolution "as equitable and as just as it can be under the circumstances...." The court ruled that Berger had a valid lien on the equipment in the amount of $7,960.75 "for the work he did to secure this property," and ordered that the equipment be sold and that Berger be paid first out of the sale proceeds. The court ordered any remaining proceeds to be divided equally between Azar and Mineral. Mineral appealed.

## I

Mineral claims the trial court committed procedural errors. Mineral asserts that the court erred in allowing Azar to intervene after the trial began. Mineral argues that it

was prejudiced by this late-hour intervention because it was unprepared to defend against Azar's claim of ownership of the equipment, especially after the trial court had previously refused to allow Berger to serve a third-party complaint against Azar. We reject Mineral's argument.

Although a motion for intervention under NDRCivP 24 must be timely, we have held that, under some circumstances, even a post-judgment motion is not too late. *See Quick v. Fischer,* 417 N.W.2d 843, 845 (N.D. 1988). Assuming Azar was not entitled to intervene as of right, permissive intervention under NDRCivP 24(b) was discretionary with the court because Azar's claim to ownership of the property involved a question of law or fact in common with the main action. 7C C. Wright, A. Miller, & M. Kane, *Federal Practice and Procedure: Civil 2d,* § 1913 (1986). Although it would have been preferable for the trial court to have allowed Azar's joinder earlier, Mineral, in response to the motion to intervene, did not seek a continuance in order to conduct discovery and to adequately prepare. Azar testified during the first day of trial, and Mineral was aware of Azar's possible interest in the property at an earlier stage. Under these circumstances, the trial court did not abuse its discretion in allowing Azar to intervene.

Mineral argues that the trial court erred in allowing Berger to maintain his claim to a lien after Berger assigned his interest to Trucking. Mineral claims that because Trucking, and not Berger, had become the real party in interest, the trial court "should not have allowed the case to continue." This argument is meritless.

After learning that Berger had assigned his lien to Trucking, Mineral moved to join Trucking as a defendant in the action under NDRCivP 19, 20 and 21. This lien assignment occurred about five months after the action began. Although NDRCivP 17, requiring that an action be brought in the name of the real party in interest, controls when an interest has been transferred before the suit is begun, NDRCivP 25(c) controls when an interest is transferred during the action. 7C Wright, Miller, & Kane, *Federal*

*Practice and Procedure: Civil 2d*, § 1958. "In case of any transfer of interest, the action may be continued by or against the original party, unless the court upon motion directs the person to whom the interest is transferred to be substituted in the action or joined with the original party." NDRCivP 25(c). One treatise explains:

The most significant feature of Rule 25(c) is that it does not require that anything be done after an interest has been transferred. The action may be continued by or against the original party, and the judgment will be binding on his successor in interest even though he is not named. An order of joinder is merely a discretionary determination by the trial court that the transferee's presence would facilitate the conduct of the litigation.

... Since the matter is discretionary [the court] may refuse substitution if this seems the wisest course.

7C Wright, Miller, & Kane, *Federal Practice and Procedure: Civil 2d*, § 1958, at pp. 555, 557, 560 [footnotes omitted]. Even if Mineral had proceeded under NDRCivP 25(c), we could not say the trial court abused its discretion in refusing to substitute or join Trucking in this case.

## II

Mineral argues that the trial court erred in determining that Berger had a valid lien on the property. We disagree.

Berger principally relied on NDCC 35–13–01, which says in pertinent part:

Any blacksmith, machinist, farm equipment dealer, welder, garage keeper, mechanic, or aviation operator, having an established place of business within this state who makes, alters, or repairs any automobile, truck, engine, combine, tractor, farm equipment, well machine, aircraft, or watercraft at the request of the owner or legal possessor of the property has a lien thereon, and on any accessories and parts placed upon the property, for reasonable charges for work done and materials furnished, until the charges are paid.

To enforce a statutory lien, the statutory terms "must be fairly met." *Rolla Commu-*

*nity Hospital v. Dunseith Community Nursing Home*, 354 N.W.2d 643, 647 (N.D.1984). Because North Dakota's statutory lien laws are remedial, we liberally construe them to effectuate their purposes of protecting those who contribute labor, skill, or materials. *Nesdahl Surveying & Engineering, P.C. v. Ackerland Corporation*, 507 N.W.2d 686, 689 (N.D.1993). We believe Berger's lien claim fairly meets the terms of the statute.

First, Berger was authorized to do the work by Azar, who was the principal stockholder and president of Dakota, which held title to the property in July 1991. Therefore, Berger acted at the request of the "owner" of the property. *Compare Briley v. Donald Knudtson Implement*, 112 N.W.2d 557 (N.D.1961). Second, Berger was a machinist or mechanic who altered an engine or well machine. We generally give the words of a statute their plain, ordinary, and commonly understood meaning. *Nesdahl Surveying*, 507 N.W.2d at 689. "Alter" means "[t]o change or make different; modify." The American Heritage Dictionary, at p. 99 (2d College ed. 1985). Berger testified that all of the equipment had to be dismantled at the well site before it was removed. He testified that pipes had to be unhooked from the tanks, electrical boxes had to be taken out, and wires had to be pulled from the ground. We believe this work was an alteration of the well within the meaning of the statute. Third, Berger's lien was perfected by possession. NDCC 35–13–02 says: "A person entitled to a lien under this chapter who retains possession of the property ... altered ... is not required to file any statement to perfect the lien."

Haugen took Mineral's president to Berger's yard to inspect the equipment before executing the bills of sale. *See generally Williston Co-op. Credit Union v. Fossum*, 459 N.W.2d 548, 551 (N.D.1990); *Timmer v. Gray*, 395 N.W.2d 477, 479 (Minn.Ct.App. 1986). Berger's possession was sufficient to notify Mineral that Berger had a lien on the equipment.

Mineral argues that Berger cannot claim a lien for some work performed by other persons he hired and that he should not be entitled to a lien for the work of

cleaning up the well site. Berger hired and paid others to do the necessary work that he lacked manpower and equipment to perform. We see nothing in NDCC Chapter 35–13 that precludes Berger, who has paid these other workers, from claiming a lien for their work, and Mineral cites no authority to the contrary.

 Moreover, incidental work that is necessary and in furtherance of an alteration can be covered by the lien. *See generally Goldberger–Raabin v. 74 Second Avenue Corporation,* 252 N.Y. 336, 169 N.E. 405, 406 (1929); *Allen v. Elwert,* 29 Or. 428, 44 P. 823, 826 (1896). Here, Berger testified that the landowner threatened to lock him off of the property unless the well site was cleaned up. Cleaning up the site was a prerequisite to doing any of the work requested by Azar, and Berger received, through Azar, Dakota's authorization to clean up the site. We believe Berger was entitled to claim a lien for these incidental and necessary services.

 Besides, even if all of Berger's work did not precisely fit the definition of work for a repairman's lien under NDCC Chapter 35–13, NDCC 35–20–11 authorizes a general possessory lien:

> Every person ... who, while lawfully in possession of an article of personal property, renders any service to the owner thereof by labor or skill employed for the repair, protection, improvement, safekeeping, or carriage thereof has a special lien thereon, dependent on possession, for the compensation, if any, which is due to him from the owner for such service.

This broader possessory lien covers any of Berger's work not specifically included in the repairman's lien statute. We conclude that the trial court did not err in determining that Berger had a valid lien on the equipment and in determining the amount of that lien.

### III

 Mineral argues that the trial court erred in determining that Azar had a valid ownership interest in the disputed property. We agree with Mineral for two reasons.

First, Azar's claim to the property hinges on his August 1992 purchase of Dakota's interest in the Heiser well from the bankruptcy trustee through the "Conveyance, Assignment and Bill of Sale." This document conveyed to Azar 100 percent of Dakota's interest "in all personal property ... now or hereafter located on or under any of the oil, gas and disposal properties ... including ... all ... replacements thereof and to include, without limiting the language of this paragraph, the personal property specifically described" in an attached exhibit. That exhibit describes the same equipment conveyed by Petroleum to Dakota in July 1989, but that was no longer located on the Heiser well in August 1992. Indeed, apparently no equipment of any kind was located on the Heiser well in August 1992.

 Interpretation of the bankruptcy trustee's "Conveyance, Assignment and Bill of Sale" is governed by the law of contracts. *See Lenihan v. Meyer,* 111 N.W.2d 696, 698 (N.D.1961); NDCC 41–02–11 and 47–09–03. As we wrote in *Red River Human Services Found. v. DHS,* 477 N.W.2d 225, 227 (N.D. 1991), the construction of a written contract to determine its legal effect is a question of law, and the intention of the parties is to be ascertained from the writing alone, if possible.

The bankruptcy trustee's "Conveyance, Assignment and Bill of Sale" is clear and unambiguous. It conveyed to Azar all personal property "now or hereafter located on or under" the Heiser well, including "replacements thereof." The attached exhibit does not specify property by serial number, but by a description "located on" the well. Through this conveyance, Azar did not receive an interest in specifically identifiable equipment, but received Dakota's interest in personal property or "replacements thereof" physically located on the well. Because no equipment was then located on the Heiser well, Azar received no interest in the equipment disputed in this case. *See Marathon Finance Corporation v. Rice Lake Auto Co.,* 239 Wis. 201, 1 N.W.2d 81, 82 (1941) [chattel mortgage describing all machinery and equipment in the garage of auto company covered property owned by it and located there at the time of the execution of the mortgage].

Azar argues, however, that the term "replacements" is broad enough to include the equipment that, in August 1992, was located in Berger's yard. The word "replace" is unambiguous and means "to take the place of as a substitute or successor; to put something new in the place of." *Southern Real Estate & Fin. v. St. Louis,* 758 S.W.2d 75, 81 (Mo.Ct.App.1988). A replacement or substitution " 'designates something placed in a position previously occupied by another thing, *and implies the removal or elimination of the thing replaced,* since something cannot be substituted for something else unless that for which the substitution is made is taken out and that which is substituted is inserted in its place.' " *Fullilove v. U.S. Casualty Company of New York,* 240 La. 859, 125 So.2d 389, 393 (1960) [quoting 83 C.J.S. p. 766; emphasis in original]. Thus, the word "replacement" ordinarily means substitution of a thing at a locatable place. While the "replacements" language would certainly cover substitutions of personal property placed on the well, it does not extend the limiting language in the conveyance to include property no longer located on the well. We conclude that Azar received no interest in this disputed property through the bankruptcy trustee's August 1992 conveyance.

Second, even if Azar had an interest in the equipment, we believe that the result would be the same. All of the parties paint Haugen as the scoundrel in this case. In *Canterra Petroleum v. Western Drill. & Min.,* 418 N.W.2d 267 (N.D.1987), we faced an analogous situation where Mitchell entrusted oil field pipe to Port Pipe for storage. Two Port Pipe employees fraudulently transferred apparent ownership of the pipe to a "dummy" corporation, Pharoah, which then sold the pipe to Nickel. Canterra ultimately acquired the pipe through Nickel. Applying the entrustment doctrine of NDCC 41–02–48 [UCC 2–403], we reasoned that the Uniform Commercial Code favors an innocent third party and endeavors to promote the flow of commerce by placing the burden of preventing a fraudulent transaction on the entruster, who is in the best position to forestall fraud. We explained:

[T]his policy . . . supports application of the entrustment doctrine to a situation where employees of the entrustee transfer the entrusted goods to their sham corporation, which in turn sells the goods to a buyer in the ordinary course of business. As between the two innocent parties in this case [Mitchell, which entrusted the pipe to Port Pipe, and Nickel, which bought the pipe in the ordinary course of business from Pharoah], the policy of the Code places the risk of the entrustee's employees fraudulently diverting and selling the goods upon the entruster, Mitchell, which had the opportunity to select its entrustee. Applying the doctrine to this case, Nickel would acquire the title of the entruster, Mitchell, and title would have passed on to the subsequent purchasers of the pipe.

*Canterra,* 418 N.W.2d at 273–274 [footnote omitted]. This policy guides our analysis here.

In this case, even though Mineral does not meet the requirement of NDCC 41–02–48 [UCC 2–403] that it be a buyer in the ordinary course of business, principles of equity supplement the Uniform Commercial Code. NDCC 41–01–03 [UCC 1–103]. Thus, in *Farmers Livestock Exchange v. Ulmer,* 393 N.W.2d 65 (N.D.1986), we recognized that the prevailing party did not qualify as a buyer in the ordinary course of business under the entrustment doctrine of the Uniform Commercial Code. Instead, we applied the long-standing and comparable equitable principle that " 'where one of two innocent persons must suffer by the acts of a third, the one whose conduct, act, or omission enables such third person to occasion the loss must sustain it if the other party acted in good faith without knowledge of the facts and altered his position to his detriment.' " *Farmers Livestock,* 393 N.W.2d at 71 (quoting that trial court). *See also* NDCC 31–11–05(34). That principle fits here.

■ Azar, for Dakota, hired Operating and Haugen to operate the Heiser well, thereby placing Haugen in possession of the equipment on that well. Haugen replaced it and, after it was removed from the well, conveyed it to Mineral. Mineral contacted Sun to determine whether Haugen had title

to the equipment and learned that Sun had given Haugen a bill of sale for the Smaco pumping unit. Haugen showed Mineral a receipt from Mor–Tech–Fab for the tank. Mineral had no reason to be aware of Azar's possible claim to the equipment. Indeed, Azar's possible claim to the equipment did not arise until August 1992, some months after Mineral received bills of sale for the equipment. Under these circumstances, we believe that Azar, having personally placed Haugen in the position to do the harm, should suffer the loss rather than Mineral. We conclude the trial court erred in awarding Azar any proceeds from the sale of the equipment.

We have considered the other arguments of the parties, and they do not affect our decision. Accordingly, we affirm that part of the judgment awarding Berger the initial proceeds of the sale of the equipment to pay his lien. We reverse that part of the judgment awarding Azar any of the proceeds of the sale, and remand for entry of judgment awarding Mineral the remaining proceeds after payment of Berger's lien.

SANDSTROM, NEUMANN and LEVINE, JJ., concur.

VANDE WALLE, C.J., concurs in the result.