Larry D. ARMSTRONG and Coleen
Armstrong, Plaintiffs,

v.

UNITED STATES of America,
Defendant.

No. A4–02–042.

United States District Court,
D. North Dakota,
Northwestern Division.

April 25, 2003.

Order Denying Reconsideration
May 23, 2003.

Jon Jay Jensen, Pearson, Christensen,
Clapp, Fiedler, Fisher & Jensen, Grand
Forks, ND, for Plaintiffs.

Hilarie Snyder, U.S. Dept. of Justice,
Tax Div., Washington, DC, for Defendant.

## MEMORANDUM AND ORDER

HOVLAND, Chief Judge.

Before the Court are cross-motions for summary judgment filed by the Plaintiffs and the Defendant. The Plaintiffs, Larry and Coleen Armstrong, initiated the above-entitled action to recover taxes they paid as a result of an allegedly erroneous assessment by the Internal Revenue Service ("IRS"). For the reasons set forth below, the Plaintiffs' Motion for Summary Judgment is **DENIED** and the Defendant's Motion for Summary Judgment is **GRANTED**.

## I.  BACKGROUND

This case is about two retirement accounts pledged as collateral for a personal loan. The dispute centers around the collateral for a 1989 loan between the Plaintiff, Larry Armstrong, and Midwest Federal Savings Bank in Minot, North Dakota. According to Larry Armstrong, he met with Thomas Gietzen, an Assistant Vice President with Midwest Federal Saving Bank of Minot, North Dakota ("Midwest Federal") to arrange for a short-term $134,000 loan. Gietzen asked for, and Armstrong agreed to provide, life insurance as collateral for the loan. Armstrong directed Gietzen to go to his office to pick up his life insurance policies. However, Armstrong's secretary gave Gietzen two retirement plan annuity contracts ("retirement policies") owned by National Marketing Company, Inc. ("National Marketing") and issued by UNUM Life Insurance Company of America ("UNUM") in lieu of Armstrong's life insurance policies.

Using information obtained from the retirement policies, Gietzen proceeded to prepare a Promissory Note, Assignment Forms, and Collateral Receipt Forms assigning National Marketing's retirement policies to Midwest Federal. Armstrong,

National Marketing's president and sole stockholder, had signed the Collateral Receipt Forms and Promissory Note in blank before Gietzen filled in the collateral information. Judy Ballantyne, National Marketing's Secretary–Treasurer, and Susan Armstrong, Larry Armstrong's daughter, also signed the Assignment Forms.

Thereafter, Armstrong learned that the forms completed by Gietzen assigned National Marketing's retirement policies to Midwest Federal as collateral for his personal loan of $134,000. Armstrong contacted Gietzen and stated that he could not pledge National Marketing's retirement policies as collateral and offered to return the loan proceeds. Gietzen reportedly acknowledged the error and assured Armstrong that Midwest Federal would consider the loan unsecured. Meanwhile, UNUM, the underwriter of National Marketing's retirement policies, recorded the assignment of the retirement policies to Midwest Federal on November 9, 1989. On November 15, 1989, Armstrong received the $134,000 from Midwest Federal and spent the money for various personal expenses.

In the fall of 1990, the Resolution Trust Corporation (RTC) took over Midwest Federal. Armstrong's loan came due on November 15, 1990. Armstrong defaulted on the loan which prompted the Resolution Trust Corporation, Midwest Federal's successor in interest,[1] to send Armstrong a demand letter in March of 1991. In June 1991, after efforts to collect from Armstrong had failed, the RTC proceeded to withdraw $159,375.53 from the UNUM retirement policies to repay Armstrong's loan. UNUM issued notice of the withdrawal of money from these retirement policies in early 1992. However, the Armstrongs did not include this money as income on their tax returns.

---

1.  The RTC was appointed as receiver for Midwest Federal in September 1990.

The Armstrongs were subsequently assessed taxes, penalties, and interest by the IRS as a result of an increase in taxable income from the retirement policies. On August 21, 1996, the IRS issued a Notice of Deficiency to the Armstrongs asserting deficiencies in the amount of $63,534 for tax year 1989 and $5,025 for tax year 1991. The deficiencies were assessed on March 26, 1996.

The Armstrongs paid the deficiencies for the 1991 tax year in full in June of 1998. They paid the IRS $156,142.02—the balance of the tax, penalty and interest due and owing for the tax year 1989—on November 1, 1999. On October 1, 2001, they filed an amended tax return for calendar year 1989, seeking a refund in the amount of $149,871 plus statutory interest. The Armstrongs also filed an amended tax return for calendar year 1991, seeking a refund in the amount of $9,505 plus statutory interest. They initiated the above-captioned action seeking a refund on April 3, 2002.

According to the Armstrongs, the IRS's assessments for tax years 1989 and 1991 were erroneous and illegal because no taxable event had occurred. Specifically, they asserted that the assignment of the retirement policies was improper because of a mutual mistake and/or lack of corporate authorization and therefore should not have been taxed as income by the IRS. Essentially, the Armstrongs contend that they never intended to pledge the policies. The Government has taken the position that the IRS neither wronged the Armstrongs nor misapplied the Internal Revenue Code. The Government also argues that the Armstrongs' complaint is misplaced because the IRS was not a party to the loan agreement between the Armstrongs and Midwest Federal. The Armstrongs never sued RTC, Midwest Federal, or UNUM for the alleged improper withdrawal. They never replaced the money in the UNUM retirement policies. Instead, the Armstrongs sued the Government for a tax refund for 1989 and 1991.

The Court, in orders dated January 3, 2003, and January 14, 2003, granted the Government's Motion for Partial Summary Judgment as to damages and dismissed the Armstrongs' claim seeking a tax refund for the 1991 tax year on the grounds that the claim was barred by the applicable statute of limitations. Therefore, the only issue presently before the Court is whether the Armstrongs are entitled to a refund for the 1989 tax year.

## II.  STANDARD OF REVIEW

The Court will grant a motion for summary judgment if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (explaining that the Court must resolve all ambiguities and draw all reasonable inferences in the non-movant's favor). If the moving party can show that there is no issue as to any material fact, then the non-moving party must "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *see also Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. 2548. A mere trace of evidence supporting the non-moving party's position is insufficient—the facts must generate evidence from which a jury could reasonably find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## III.  LEGAL DISCUSSION

Money deposited in retirement plans such as National Marketing's retirement policies is generally not taxed until withdrawn, assigned, or pledged. *See* 26 U.S.C. §§ 72(d), 72(p)(B), 401(a), 402(a),

402(b), and 501(a). Because of the favorable tax treatment given such retirement policies, money can be withdrawn, assigned, or pledged without penalty only when the recipient reaches a certain age. If money is withdrawn, assigned, or pledged earlier, the recipient is required to pay taxes on that money as well as an early withdrawal penalty of 10%. *See* 26 U.S.C. § 72(q).

Section 72(p)(1) of the Internal Revenue Code treats loans, assignments, and/or pledges as taxable distributions from qualified retirement plans. It provides that:

> (A) Loans. If during any taxable year a participant or beneficiary receives (directly or indirectly) any amount as a loan from a qualified employer plan, such amount shall be treated as having been received by such individual as a distribution under such plan.
>
> (B) Assignments or pledges.—If during any taxable year a participant or beneficiary assigns (or agrees to assign) or pledges (or agrees to pledge) any portion of his interest in a qualified employer plan, such portion shall be treated as having been received by such individual as a loan from such plan.

26 U.S.C. § 72(p)(1).

The Armstrongs do not dispute the application of Section 72(p)(1) of the Internal Revenue Code. Rather, they assert that money withdrawn from National Marketing's retirement policies should not have been taxed as a disbursement by the IRS because the underlying assignment of the retirement policies to Midwest Federal was invalid. Larry Armstrong maintains that the assignments were forwarded to UNUM without his knowledge or consent; that he did not complete the requisite corporate authorization resolution necessary to effectuate such an assignment; and that neither he nor Midwest Federal ever intended to use the retirement policies as security for his loan of $134,000. He also

maintains that the assignment was void because it had not been approved by National Marketing's Board of Directors.

### A. *MISTAKE OF FACT*

Larry Armstrong asserts that there was a mutual mistake of fact and that neither he nor Midwest Federal intended to assign National Marketing's retirement policies as collateral for the loan. As a result, Armstrong maintains that the assignment was "void or unenforceable" for lack of mutual consent. The Government counters that any lack of mutual consent is inconsequential in this case because Armstrong is not seeking to reverse, rescind, or revise his loan agreement with Midwest Federal. In the alternative, the Government asserts that even if the assignment was deemed void, the retirement proceeds received by the Armstrongs are still taxable because they accepted the benefit of the assignment-the repayment of their loan. In other words, Armstrong borrowed money from Midwest Federal; signed documents collateralizing the loan with the UNUM retirement policies; defaulted on the loan; the RTC withdrew previously untaxed retirement money to repay Armstrong's overdue personal loan; and Armstrong benefitted by receiving the money and being taxed by the IRS in accordance with the realities of the transaction.

The assignment at issue is governed by the law of contracts. *See North Dakota Mineral Interests, Inc. v. Berger,* 509 N.W.2d 251, 256 (N.D.1993). The construction of a written contract is an issue of law. *Lenthe Investments, Inc., v. Service Oil, Inc.,* 636 N.W.2d 189 (N.D.2001). Under North Dakota law, the consent of the parties is essential to the existence of a valid contract. *See* N.D. Cent.Code § 9–01–02. Their consent must be free, mutual, and communicated by each to the other.

*See* N.D. Cent.Code § 9–03–01. Consent is not real or free when obtained through, among other things, mistake. *See* N.D. Cent.Code § 9–03–03. It is not considered mutual unless the parties all agree upon the same thing in the same sense. *See* N.D. Cent.Code § 9–03–16.

■ For the purposes of the Armstrongs' motion, the Court accepts that Larry Armstrong and Gietzen were under the mistaken belief that National Marketing's retirement policies would not be used as collateral. However, the existence of such a mistake is not dispositive. A mutual mistake alone does not, as the Armstrongs suggest, render a contract void or without legal force and binding effect under state law. Rather, it renders the contract *voidable*. *See* N.D. Cent.Code § 3–01–10 (ratification may be rescinded when made without such consent as is required in a contract or with an imperfect knowledge of the material facts of the transaction ratified, but not otherwise); N.D. Cent.Code § 32–04–17 (when a written contract does not truly express the parties intentions on account of a mutual mistake, it may be revised on the application of a party aggrieved).

■ Avoidance of such a contract would generally require that one of the parties take action. *See* N.D. Cent.Code §§ 3–01–10 and 32–04–17. However, the Armstrongs are not seeking a contractual remedy, but instead, a tax refund. The IRS was not a party to the Armstrongs' loan agreement with Midwest Federal. More important, the IRS has not wronged Armstrong or misapplied the Internal Revenue Code. There is nothing in the record to indicate that the Armstrongs took any direct action to reform or rescind the loan agreement that precipitated their dispute with the IRS. The record establishes that UNUM contacted Armstrong in November of 1989 to confirm the assignment to Midwest Federal. Despite his protestations

that the assignment was made in error, Armstrong waited until April 2002–approximately 13 years-to launch this collateral attack on the validity of the assignment. Regardless of whether the assignment was voidable, the fact remains that it was never voided and any efforts to void the assignment were never followed through to completion.

## B. *LACK OF BOARD AUTHORIZATION*

The Armstrongs also contend that the assignment was void and unenforceable as a matter of law because National Marketing's Board of Directors did not approve the assignment of its retirement policies to Midwest Federal as required by National Marketing's bylaws and by Section 10–19.1–89(1) of the North Dakota Century Code. In response, the Government argues that Section 10–19.1–89(1) does not prescribe the remedy sought by the Armstrongs; that proceeds of National Marketing's retirement policies were in fact used to repay Larry Armstrong's loan; and that a majority of National Marketing's Board did approve the assignment as evidenced by the operative documents signed by Larry Armstrong and Judy Ballantyne.

■ Section 10–19.1–89(1) of the North Dakota Century Code permits corporations to guarantee or pledge its assets if it obtains the approval of its Board of Directors. However, as the Government correctly points out, it does not prescribe the remedy or explicitly state that an assignment lacking board approval is void per se.

■ A settled principal of tax law is that transactions are to be given effect based on what has actually happened. *Comm'r of Internal Revenue v. Nat'l Alfalfa Dehydrating and Milling Co.*, 417

U.S. 134, 138, 94 S.Ct. 2129, 40 L.Ed.2d 717 (1974). There is no dispute that the assignment forms signed by Judy Ballantyne assigned National Marketing's retirement policies to Midwest Federal. There is no dispute that the loan agreement signed by Larry Armstrong referred to the assignment forms. Judy Ballantyne and Larry Armstrong constituted two-thirds of National Marketing's Board of Directors.[2] The fact remains that the Armstrongs never pursued an action to rescind or revise the agreement after learning of the assignment. Whether or not the Board of Directors approved the assignment, it is clear and undisputed that monies from the contract were ultimately used to satisfy the Armstrongs overdue debt to Midwest Federal. The Armstrongs have unquestionably reaped a benefit as a result of the assignment and they cannot avoid the tax consequences of the assignment.

## IV. CONCLUSION

This is a tax refund suit. It is not an action in contract. Although the Armstrongs claim that the assignment at issue was invalid, the Armstrong have not challenged the validity of the assignment which was executed approximately 13 years ago, and they have taken no steps to revise or rescind the underlying loan agreement with Midwest Federal. The Armstrongs cannot escape the tax consequences wrought by the assignment after having enjoyed its benefits. The IRS taxed the Armstrongs based on the realities of the transactions that were carried out. Accordingly, the Court **GRANTS** the Government's Motion for Summary Judgment (Docket No. 30) and **DENIES** the

Armstrongs' Motion for Summary Judgment (Docket No. 31).

**IT IS SO ORDERED.**

## ORDER DENYING MOTION FOR RECONSIDERATION AND REQUEST FOR COSTS

Before the Court is the Plaintiffs' Motion to Reconsider. Judgment in favor the Government was entered pursuant to the Court's Memorandum and Order dated April 25, 2003. The Plaintiffs request that the Judgment be amended pursuant to Rule 59(e) of the Federal Rules of Civil Procedure to award summary judgment in their favor. In the alternative, the Plaintiffs request relief from the Judgment pursuant to Rule 60(b) of the Federal Rules of Civil Procedure. The Government resists the Plaintiffs' motion and seeks the recovery of costs in the amount of $2,213.55.

Having carefully reviewed the record, the Court finds no basis for reversing its previous Order. Accordingly, the Court **DENIES** the Plaintiffs' Motion for Reconsideration (Docket No. 48). Further, the Court, in its discretion, **DENIES** the Government's request for costs (Docket No. 50).

**IT IS SO ORDERED.**

**2.** National Marketing's Board of Directors consisted of three officers-President Larry Armstrong, Vice President Coleen Armstrong, and Secretary–Treasurer Judy Ballantyne.